[Civ. No. 17929. Fourth Dist., Div. Two. Aug. 18, 1978.]

JULIUS S. AUSTERO, Plaintiff and Respondent, v.
NATIONAL CASUALTY COMPANY OF DETROIT, MICHIGAN,
Defendant and Appellant.

**4**

**COUNSEL**

Cummins, White & Breidenbach, Breidenbach, Swainston, Yokaitis & Crispo, W. F. Rylaarsdam, James R. Robie and Howard D. Swainston for Defendant and Appellant.

Herbert Hafif, Stephen Odgers and Wayne J. Austero for Plaintiff and Respondent.

**OPINION**

**McDANIEL, J.**—The action in the trial court was for breach of contract, declaratory relief, emotional distress, so-called bad faith, and for fraud brought by an insured in a first party case against his own disability insurance carrier (the Company). Trial was had before a jury. The jury

returned a verdict in favor of plaintiff in the amount of $67,200 compensatory and $336,000 exemplary damages. By later stipulation of counsel, $2,800 in interest was added to the award. The Company now appeals from the judgment entered on the verdict.

## THE POLICY PROVISIONS

In 1957, plaintiff as a member of a group developed from the roster of the Orange County Bar Association subscribed for disability coverage under a policy written by the Company. In 1969, a new policy was issued, which provided in pertinent part:

"SECTION II

"TOTAL DISABILITY. If 'such sickness' shall wholly and continuously disable and prevent the Member from performing any and every duty pertaining to his occupation or profession, the Company will pay the Monthly Sickness Indemnity, as written in this Certificate of Insurance issued to the Member, for the period, commencing with the first (1st) day of hospital confinement or with the eighth (8th) day of such disability, whichever shall occur first, the Member shall be so disabled and under the regular care and personal attendance of a legally qualified physician or surgeon, other than himself, but not to exceed twenty-four (24) consecutive months as the result of any one sickness.

"SECTION XI

"STANDARD PROVISIONS. (7) Affirmative proof of loss on which claim may be based must be furnished to the Company not later than ninety days after the date of such loss."

In January 1973, a third policy was issued which provided in pertinent part:

"PART II. MONTHLY SICKNESS BENEFIT

"TOTAL DISABILITY. If, 'such sickness' shall wholly and continuously disable and prevent the Insured from performing any and every duty pertaining to his profession or occupation, the Company will pay periodically the Monthly Sickness Benefit as stated in the certificate Schedule for the period, beginning on the day benefits for sickness commence as stated in the certificate Schedule, the Insured shall be so

disabled and under the regular care and personal attendance of a legally qualified physician or surgeon, other than himself, but not to exceed twenty-four (24) consecutive months as the result of any one period of sickness.

"PART IV. WAIVER OF PREMIUM.

"After six (6) continuous and consecutive months of total disability for which the Monthly Accident Benefit is payable under Part I, or the Monthly Sickness Benefit is payable under Part II, during which period the Insured's insurance under the policy has been maintained in force, the Company will waive the payment of any premium becoming due during any further continuous period of such total disability for which either such monthly benefit is payable, and the Insured's insurance under the policy will remain in force during the renewal period or periods for which premium has been waived, subject to all the provisions and conditions of the policy, except as to premium payment.

"PART IX. POLICY PROVISIONS.

"PROOFS OF LOSS: Written proof of loss must be furnished to the Company within ninety (90) days after the termination of the period for which the Company is liable. Failure to furnish such proof within the time required shall not invalidate nor reduce any claim if it was not reasonably possible to give proof within such time, provided such proof is furnished as soon as reasonably possible and in no event, except in the absence of legal capacity of the Insured, later than one (1) year from the time proof is otherwise required."

THE DISABILITY HISTORY

Plaintiff entered private law practice in 1955, and, until 1971, maintained a successful and prosperous practice.[1] In 1971, plaintiff's son, Wayne, passed the California State Bar Examination and became an associate in his father's firm. During 1971, according to the later statements of both Wayne and Mrs. Austero, plaintiff's work load dropped markedly, and from 1971 to 1974, the practice was maintained largely by Wayne. In September 1971, plaintiff saw his family physician, Dr. MacLachlan. He complained of sinus trouble and memory loss. The doctor observed that during the previous four months plaintiff had

---

[1]Plaintiff's son, Wayne, testified that his father's net income was approximately $85,000 to $100,000 a year before 1970.

experienced loss of memory and occasional incidents where his mind would go blank. Plaintiff's firm ended the year 1971 with a gross income of $85,313 and a net income of $24,221. His activities for the year comprised in part: 258 hearings as compared with 284 in 1970 (or 21.5 per month), 578 client appointments, as compared with 640 in 1970 (or 48.2 per month), and 16 depositions, as compared with 11 in 1970 (or 1.3 per month).[2]

In 1972, plaintiff maintained daily office hours of 9 a.m. to 5 p.m. However, his secretary later stated that he spent much of his time "putter[ing] [a]round . . . empty[ing] trash, do[ing] janitorial work and would very seldom talk to clients. She herself handled most of the clients . . . or when Wayne was there he would do so." When plaintiff took depositions, he usually had the questions prepared in advance on paper and would simply read them. He also made court appearances, but did so largely at arraignments and default divorces where extensive attorney participation is not required. Wayne testified at trial that during 1972 his father drafted no pleadings or briefs and performed no legal research. He further testified that most of the work he did himself. Both Wayne and plaintiff's secretary agreed that plaintiff conducted his last contested trial in March of 1972.

At trial, the Company introduced evidence indicating that beside making court appearances for arraignments and default divorces, plaintiff also represented clients at order to show cause hearings, negotiated pleas in criminal cases and appeared at sentencing hearings. During the year 1972, plaintiff appeared at a total of 251 hearings (or an average of 20.9 per month), had 689 scheduled office appointments (or 57.3 per month) and took 16 depositions. The firm grossed $80,972 in 1972 and netted $28,951.

In May of 1972, plaintiff was referred to Dr. Berle I. Barth, a neurologist, by Dr. Samuel J. Camerata. Plaintiff complained to Dr. Barth of "impaired memory . . . difficulty in spelling, inability to remember what he . . . read, misplacing objects, increased irritability, all of which [had] been present for six to twelve months, and [were] increasing in frequency and severity." Other than these symptoms, plaintiff denied having any medical problems other than phlebitis of his

---

[2]These statistics were compiled in 1975 by a private investigator employed by the Company's counsel. The record does not indicate whether or not the Company was informed of these statistics at the time the claim was under consideration.

left leg. After concluding a full neurological examination, Dr. Barth composed the following note:

"A detailed neurologic examination today, and that is 15 May 1972, reveals an obese man, fat, who does not know typical landmark law cases, which any practicing attorney should remember. He is not up to date on current events, has great difficulty with calculations in his head, particularly with subtraction of serial sevens, making several typical organic mistakes. His interpretation of proverbs is fairly concrete. His digit span forwards is four numbers, and he consistently makes mistakes with more than four numbers. His judgment is significantly impaired. [¶] On examination of his cranial nerves, one through twelve, they're intact. His blood pressure is 170 over 100 in both arms, sitting. He has no head, eye or neck bruises, murmurs. [¶] He is slightly unsteady on his feet, and has some difficulty with tandem walking, walking a line. His strength and tone are normal. Heel to knee to shin testing is normal. Finger to nose testing is well-done. Deep tendon reflexes are one plus and symmetrical, except for two plus knee ex. No Babinski signs and no fullness is present, detail sensory testing is normal, and it was my clinical impression at that time that the patient was suffering from encephalopathy, cause undetermined, possibly pre-senile dementia."

Dr. Barth also performed an electroencephalogram which indicated "slowing, consistent with generalized brain disturbance." He further ordered a series of psychological tests to be performed "to determine [plaintiff's] intellectual functions."[3] He informed plaintiff that, in his opinion, plaintiff was "seriously intellectually impaired" and should be hospitalized, however, plaintiff declined to be hospitalized.

At trial, Dr. Barth testified that the disease plaintiff suffered from was progressively disabling—that one afflicted with it could continue to function for a period of time, and that a man in plaintiff's condition, as of

---

[3]The results of those tests were as follows: " 'During evaluation, Mr. Austero exhibited a free associate thought process.' Means he rambled. 'Directions had to be repeated often and his mind wandered. He exhibited problems in speech, mispronounced words and had word finding difficulty. Mr. Austero was given the Bender visual motor Gestalt test, and the Wexler adult intelligence test. The results are as follows: Mr. Austero reveals a level of intellectual functioning consistent with the average range, IQ 108. His memory for the past is good. His memory for present events is impaired. His social judgment and the logical character of his thinking process is good. [¶] Mr. Austero can deal well with whole-part relationships, and his basic perceptual, conceptual abilities fall in the superior range. Mr. Austero's mental control is impaired, as well as his ability to pay attention and sustain concentrated effort. His gross motor performance is good, but his fine motor activity is impaired. Performance on visual motor organization test is also impaired.' "

May 1972 would experience "some diminution in his abilities." He further testified that the onset of presenile dementia could not accurately be pinpointed. He stated his conclusion that in the spring of 1972, plaintiff "had difficulty reading, spelling, adding and subtracting. He had poor judgment, and he didn't know some of the basic things that I learned in first semester law school. Something that every attorney knows, or should know, or have some idea about." He opined that a man in plaintiff's condition would not be capable of reading and interpreting cases and drawing principles of law from them.

On July 13, 1972, Dr. Stanley van den Noort examined plaintiff who complained of a year-long decline in mental ability. At that time, Dr. van den Noort diagnosed plaintiff's condition as "endogenous depression," rather than presenile dementia, and he recommended psychological treatment. However, Dr. van den Noort later changed his mind and concluded that plaintiff "was unable to function as a competent attorney or to make complex decisions with regard to his own personal affairs in 1972; subsequent events have demonstrated that this disability was in fact due to Presenile Dementia." In a letter composed in September 1974, Dr. van den Noort stated "I did feel that Mr. Austero was disabled from the practice of law in July 1972 . . . . [H]e was not able to function as a lawyer in July 1972 . . . ." However, he added "the major complaint at that time was derived from his son who made representations to physicians that his father was unable to competently continue the practice of law at that time." In the same letter, the doctor stated that he did not encourage plaintiff to discontinue his legal practice in 1972 because "it was important to sustain his personal motivation" at that time.

Throughout 1973 plaintiff continued to keep regular office hours (9-5) but his secretary observed that plaintiff spent that time, for the most part, as he did in 1972, puttering around the office and seeing a few clients. According to his trial testimony, Wayne continued to do most of the work, but did not consider his father incompetent at that time. Plaintiff, however, took depositions and appeared in court on both contested and noncontested matters. In January, February, April and June, plaintiff appeared before Superior Court Judge Williams, who had known plaintiff for approximately 20 years. Judge Williams testified at trial that during all of his appearances, plaintiff seemed fine, except for a speech problem on all occasions, and fatigue during the January appearance.

At the end of the year, plaintiff's firm had grossed $78,788 and netted $37,136.[4] During the first 8 months of 1973,[5] plaintiff made appearances at 113 hearings, or approximately 14 per month, 360 client appointments, or 45 per month, and took 4 depositions.

In March, April, and May of that year (1973) three premium notices were sent to plaintiff by the Company. He did not pay the premium, and *the policy lapsed on April 10, 1973.*

In September of 1973, plaintiff went to the chambers of Judge Williams and informed him that he was having memory problems. Judge Williams insisted that plaintiff see a doctor. As a consequence, plaintiff was hospitalized in September and further tests were conducted by his then attending physician, Dr. O'Connor. Those tests revealed that plaintiff had suffered generalized brain atrophy, or shrinkage. He was discharged three days later. Dr. O'Connor did not inform plaintiff of his condition and he advised Wayne and Mrs. Austero to encourage plaintiff to continue going to work in order to avoid becoming depressed.

On December 11, 1973, plaintiff applied to the Company for major medical coverage. He filled out a standard form, which included the following question, "Are you now engaged in the full time active duties of your profession or occupation?" To this question, plaintiff answered in the affirmative. To the question, "To the best of your knowledge and belief, have you . . . been under observation or had any medical or surgical advice or treatment or been hospital confined during the past 5 years?" Plaintiff answered in the negative. Plaintiff responded affirmatively to the question, "To the best of your knowledge and belief, are you . . . now in good health and free from any physical impairment or sickness or disease?"

In 1974, plaintiff's condition continued to deteriorate, and he went to his office only occasionally to sign checks. However, this pattern ceased in March of that year when plaintiff was forbidden to drive a car. Thereafter, plaintiff spent much of his day taking walks, talking to neighbors and watching television. Because of the loss of income occasioned by plaintiff's condition, Mrs. Austero found it necessary to

---

[4]At trial, Wayne testified that this higher than usual net income was due to the fact that he did not take his salary in 1973. In August 1973 Wayne left his father's firm because of a series of disagreements that erupted between him and his father.

[5]The Company's investigator failed to compile statistics for the last four months of the year.

seek employment, and the couple had to move from their apartment at the Balboa Bay Club to a less expensive one but still in Newport Beach. According to Wayne, the move greatly depressed plaintiff, who felt uncomfortable in his new and unfamiliar surroundings.

In 1974, Wayne discovered two certificates for disability policies his father carried—one with defendant and another with Washington National Insurance Company. Application was made to both companies for total disability payments under the policies. Both companies rejected the claims. Eventually, Washington National Insurance Company, in an effort to settle their dispute with plaintiff, requested that he be examined by Dr. William Oldendorf, a neurologist and psychiatrist. Dr. Oldendorf's examination of plaintiff took place in March 1976. That doctor also reviewed the reports of Drs. MacLachlan, O'Connor, van den Noort and Barth, as well as plaintiff's hospital records. Dr. Oldendorf concluded that as of the time of his examination of plaintiff, the latter was severely disabled, and that disability began "in about 1971."

At trial, the doctor was asked if, as of May 1972, plaintiff was "capable of doing the intellectual functions of a lawyer[.]" Dr. Oldendorf responded, "It would depend upon how demanding a situation he was in. I think he could probably get away with it, if adequately supported and in familiar surroundings." The doctor opined that as of the latter part of 1972, plaintiff would have been able to do anything "that was relatively simple, that he could do habitually, that he had done many times over a period of many years, and which he could do . . . [which] wouldn't be terribly demanding and for which there was no great competition."

### THE COMPANY'S HANDLING OF PLAINTIFF'S CLAIM

As already noted, the policy lapsed as of April 10, 1973, for nonpayment of premium. In June 1974, Harry Commons, the Company's claims manager, received a letter from Wayne Austero. Enclosed was a completed claim form dated April 10, 1974, and signed by plaintiff. On the form, plaintiff indicated that his first symptoms began in May 1971 and his first treatment took place on September 20, 1973. He stated that he stopped working on September 20, 1973 (five months after the policy had lapsed). He listed Drs. Barth and van den Noort as attending physicians. He claimed, as his dates of total disability, "From 9-20 1973 . . . to Permanent . . . ." He further noted that he would "not return to work." The back of the form was filled out by Dr. O'Connor. Thereon, Dr. O'Connor indicated the diagnosis for plaintiff and current condition

as "Diffuse, marked cortical atrophy, clinical impression." He listed the services he rendered plaintiff, both in and out of the hospital, the dates of those services and the amount he charged for each. In the blank provided for "Date symptoms first appeared . . ." the doctor wrote "June, 1973," then crossed it out and wrote "May 1971." He indicated that plaintiff first consulted him for this condition on September 20, 1973, and that he was still under his care for this condition. Category 8 on the form read "Patient was continuously totally disabled (unable to work)." In the blank provided for a response, Dr. O'Connor wrote "DNA" (meaning does not apply). Category 9 read "Patient was partially disabled," underneath which the doctor again wrote "DNA." He also wrote "DNA" in the space provided for category 10, which read "If still disabled, date patient should be able to return to work."

Commons routinely ordered copies of plaintiff's hospital records. He received those records on July 11, 1974. Included as part of plaintiff's hospital discharge summary were notations made by Dr. O'Connor as to plaintiff's medical history.[6] The history indicated that plaintiff complained of rapid mental deterioration which dated back three months (to June of 1973). It further reported a blackout plaintiff had experienced in May 1973, and noted plaintiff's occasional misuse of words and depression following the blackout episode. The history also revealed that plaintiff's ability to concentrate had diminished over the past six weeks (beginning in August 1973).

On July 12, 1974, Commons wrote to Dr. O'Connor and asked him to explain his "DNA" responses to questions on the claim form in light of plaintiff's allegation that he was totally disabled. Commons enclosed a self-addressed stamped envelope. He later testified at trial that *he never received a response from Dr. O'Connor.*

On July 17, 1974, he wrote to plaintiff and told him, because all the information up to that date submitted indicated that plaintiff's claimed disability had occurred after coverage lapsed on April 10, 1973, the Company was rejecting his claim.

Three weeks later, Wayne responded by sending Commons a copy of Dr. van den Noort's letter of August 6, 1974. As noted before, Dr. van den Noort explained in the letter that in 1972 he diagnosed plaintiff's

---

[6]Those hospital records were not included in the documents submitted to us, therefore, we must rely on Mr. Commons' trial testimony as to their contents.

condition as "endogenous depression" but changed his mind after receiving the results of tests conducted in 1973 and 1974. The doctor continued, "[w]ithin the limits of reasonable medical certainty, it is clear that Mr. Austero was unable to function as a competent attorney or to make complex decisions with regard to his own personal affairs in 1972 . . . ." Wayne indicated, despite plaintiff's previous statement that total disability commenced September 20, 1973, that it had actually begun before April 10, 1973. *He did not, however, specify on what date it had commenced.*

Soon thereafter, Commons replied to Wayne, stating "I see no indication in Dr. Van den Noort's letter as to a commencement date of total disability, and call your attention to the claim form which you previously submitted, in which Mr. Austero claimed the commencement date of total disability was September 20, 1973. We would appreciate your having Mr. Austero indicate on what date . . . he last practiced law, and give all dates of treatment by physicians or surgeons since the claimed commencement of total disability by them, prior to the previously claimed date of September 20, 1973. [¶] We will appreciate your submission of Dr. Barth's letter . . . as well as any other information concerning Mr. Austero's claimed total disability, which will assist in the reconsideration . . . . [W]e can only restate that all coverage had lapsed prior to the claimed commencement of total disability, and *that no proof of total disability prior to September 20, 1973, has been presented.*" (Italics added.)

Commons also wrote to Dr. van den Noort, asking him to list the dates the doctor had treated plaintiff, and to "indicate whether you felt Mr. Austero was totally disabled from the practice of law on July 13, 1972 [the date of van den Noort's examination], and whether you informed him at that or any other time, that he should discontinue the practice of law." He also asked the doctor to forward any consultations, reports or tests "which you think would be helpful in the consideration of Mr. Austero's claim for total disability benefits. . . ."

Commons then ordered a retail credit check of plaintiff because "there was doubt as to the date of the commencement of total disability" and because of Dr. O'Connor's ambiguous responses to questions concerning total and partial disability on the claim form. Those making the credit report were directed to trace plaintiff's professional activities, and discover when they ceased. According to Common's later testimony at

trial, it was essential to determine whether plaintiff worked after the time he claimed to have been totally disabled.

On August 16, 1974, Commons received a reply from Wayne which contained a medical report from Dr. Barth. Wayne wrote, "It is obvious from Dr. Barth's medical reports and the reports from Dr. Stanley van den Noort . . . that Mr. Austero was rendered unable from performing any and every duty pertaining to his profession on May 15, 1972 . . . ." Wayne then demanded the payment of total disability benefits which had accrued after May 15, 1972, as well as the return of any premium paid after six months following that date.[7] He added, "In view of the extreme financial difficulties and extreme emotional harm brought upon Mr. Austero's family due to this disability, I would expect your company to take care of this claim forthwith." Enclosed with the letter was Dr. Barth's letter to Dr. Camerata of May 17, 1972, a "To Whom it May Concern" letter authored by Dr. Barth on August 12, 1974,[8] a letter from the doctor who conducted the psychological tests on plaintiff,[9] a clinical note authored by Dr. Barth,[10] and an electroencephalogram submitted by Dr. Barth.[11]

Commons responded to Wayne, noting that the copy of Dr. Barth's May 17, 1972, letter was partially illegible, as was the date on the electroencephalogram. All other enclosures submitted by Wayne were noted as received. In his reply letter, Commons requested legible copies of Dr. Barth's May 17 letter and the electroencephalogram. Commons went on to state that plaintiff had applied for major medical coverage

[7]This demand was made pursuant to part IV of the policy, the waiver of premium clause, which is set forth earlier in this opinion.

[8]Therein, Dr. Barth explains that on May 15, 1972, plaintiff complained of "impaired memory, difficulty concentrating, difficulty in spelling, inability to remember . . . misplacing objects and increased irritability" which had been persistent for six to twelve months prior. He stated "I found that he had significant changes in mentation, judgment, ability to calculate, and difficulty in abstraction . . . . It was felt that he had . . . possibly a presenile dementia. I strongly recommend that the patient 'be hospitalized . . . . [¶] I obtained an electroencephalogram which was slower than one would expect for a man of this age . . . . I also obtained psychometric evaluation, which . . . concluded that he had 'significant intellect [sic] deterioration.' [¶] I feel that . . . his neurologic examination . . . substantiated a diagnosis of . . . (chronic brain syndrome) . . . ."

[9]This letter was also not included in the record before us, however, Dr. Barth testified at trial as to Dr. Sukoff's findings.

[10]Although Wayne's letter does not disclose the date of this note, Commons' reply letter places it at July 11, 1972. It is apparent from this that the clinical note sent Commons was not the same one made by Dr. Barth on May 15, 1972, which appears on page 8 of this opinion. A copy of the July 11 note was not made part of the record here, therefore we were unable to consider it.

[11]The results of the electroencephalogram were also not included in the record.

with the Company in December 1973, and that on his application, had claimed that he was then "engaged in the full-time, active duties of [his] profession [and] . . . was . . . free from any physical impairment or sickness or disease." He also noted that on his application for disability benefits, plaintiff claimed that total disability began on September 20, 1973, but subsequently changed this to May 15, 1972. Commons stressed that throughout their correspondence, plaintiff had failed to inform the Company when he last practiced law and where he received medical treatment for his condition, *despite the policy provision which requires the insured to supply affirmative proof of loss within 90 days of total disability.*

Commons requested that plaintiff or Wayne "submit proper, affirmative proof of loss . . . that [plaintiff] did not practice law after the May 15th, 1972 date[,] [a]nd proof of regular care and attendance by a physician or surgeon, from the claimed commencement of total disability, to the present date, as well as an explanation as to the reason for both the extremely late notice of claim filed with the company, and the reason for the revision in commencement date of total disability, from the initial September 20th, 1973 date, to that of May 15th, 1972." *According to Commons, no response was made by plaintiff or Wayne to these requests.*

In September 1974, Commons left his position with the Company. Before leaving, he turned the plaintiff's file over to John Noonan, the Company's director of association and individual benefits. At that time, he pointed out to Noonan that he had been contacted by Washington National Insurance Company, who also carried a disability policy on plaintiff. Plaintiff had likewise allowed his Washington National policy to lapse, then claimed benefits under it for total disability. Washington National had also denied plaintiff's claim. Commons informed Noonan that Washington National had been threatened with suit by Wayne Austero because of their handling of the claim. Commons commented "From the tenor of [Wayne] Austero's letter [to us], you can see a thinly veiled attempt to set up a claim for damages, claiming extreme emotional harm to the family, and extreme financial difficulties.[12] [¶] I would appreciate you reviewing this . . . . I understand that [plaintiff] still goes to the office daily, for therapeutic reasons, it is claimed . . . . [¶] I believe he continued to work far past May 15th, 1972, and he represented to us even in the December 1973 application [for major medical coverage], that he was actively engaged as an attorney. [¶] In addition it appears that he did not receive regular treatment for any illness claimed."

[12]This refers to Wayne's letter to Commons which appears earlier in this opinion.

After Commons left the Company, it received the retail credit reports he had ordered. One of those reports detailed interviews with plaintiff and Mrs. Austero and with plaintiff's secretary, Joan Roche, in September 1974. At that time it was reasonably apparent that plaintiff was severely disabled. Statements made by Mrs. Austero concerning plaintiff's pre-1974 condition have been noted before as were the comments of Mrs. Roche. The second report contained an interview with Wayne. Most of his comments have also been previously noted. He stated during the interview that his father settled many of his cases out of court during the years 1970-1973, and that his father's last contested trial was in March 1972. He explained that he did not have his father declared incompetent on the advice of Dr. O'Connor, who warned that such a move could make plaintiff depressed or violent. Wayne also stated that he did not discover that the Company carried a policy on his father until February 1974.

Finally, on September 16, 1974, the Company received a second letter from Dr. van den Noort which stated, "I did feel that Mr. Austero was disabled from the practice of law in July 1972. Since he was in practice with his son, at that time, and it was important to sustain his personal motivation, I did not urge him to discontinue the practice of law at that time . . . . It is my opinion that he was not able to function as a lawyer in July 1972 and the major complaint at that time was derived from his son who made representations to physicians that his father was unable to competently continue the practice of law at that time."

At trial, selected parts of Mr. Noonan's deposition were read concerning how plaintiff's claim was handled. Mr. Noonan stated that the Company believed, in good faith, that plaintiff had not been disabled as of April 10, 1973, and felt it was justified in rejecting his claim. Noonan testified that he had had little or no experience with presenile dementia before handling plaintiff's claim, but did not seek outside medical opinions as to the claim.

As to the Company's regular practice, Noonan testified that if a worker severely injured his hand and submitted a disability claim, backed up by a doctor's report, nothing more would be required by the Company to pay out on the claim except monthly reports from the claimant as to the progress of his condition and, in some cases, periodic medical reports.

Noonan stated that Drs. van den Noort, Barth, Oldendorf and O'Connor all agreed that plaintiff suffered from presenile dementia, which began prior to April 10, 1973. However, Noonan added, the

Company had before it evidence that he continued to work after that time,[13] that he went regularly to the office and performed "some routine legal duties."

As to the medical evidence before him, Noonan stated "the doctors . . . relate . . . to the probability [of the disease], but never related that he was disabled at that time. They related symptoms." Noonan did concede that a medical doctor was best qualified to determine when presenile dementia prevented one from performing the substantial and material duties of his profession. He further conceded that he did not credit Dr. van den Noort's opinion that plaintiff was unable to function as an attorney in 1972 "with sufficient weight to in effect pay this claim."

On November 1, 1974, plaintiff brought suit against the Company. In count one of the first amended complaint, he alleged that he became totally disabled on May 5, 1972, and that he demanded that the Company return the premiums he submitted after that date and to pay him total disability benefits. As a result of the Company's failure to do either, he claimed to have been damaged in an amount in excess of $10,000.

In count two, plaintiff sought a declaration that he became disabled before the policy lapsed.

In count three, plaintiff alleged that the Company acted in bad faith in denying his claim. As a result of this, plaintiff suffered "losses of benefits under the policy . . . economic loss including attorney's fees, embarrassment, humiliation, and . . . physical, mental and emotional distress . . . ." He further alleged that the Company denied plaintiff benefits, knowing he was entitled to them and did so "maliciously and oppressively, with the intent to vex and annoy" plaintiff.

In count four, plaintiff alleged a cause of action for breach of the Company's duty of good faith to plaintiff, and in count five, fraud was pleaded.[14] Plaintiff prayed for both compensatory and exemplary damages.

---

[13]One source of this information was the statement of Wayne, another was the statement of Mrs. Roche contained in the retail credit report.

[14]The Company interposed a demurrer to the fifth cause of action, which was granted. That cause of action was then dismissed. The first amended complaint, in its original form, also contained two causes of action brought on behalf of Mrs. Austero. However, those counts were demurred to; the demurrers were sustained and those counts were dismissed.

Trial was had before a jury. At the conclusion of the presentation of evidence, the jury rendered its verdict in favor of plaintiff and against the Company. They awarded a total of $67,200 in compensatory damages ($33,600 for full policy benefits retroactive to May 1972, and extending to May 1979;[15] and $33,600 "to compensate plaintiff for [his] emotional distress . . ."). In addition, the sum of $336,000 in exemplary damages was awarded, plus, as a result of stipulation of counsel, $2,800 in interest.

The Company interposed unsuccessful motions for a new trial and for judgment notwithstanding the verdict. The Company then appealed from the judgment, attacking the propriety of the award of total disability benefits, the damages for emotional distress, and the exemplary damages.

ISSUES AND DISCUSSION

We begin with the often recited rules of appellate review: " '[W]hen a verdict is attacked as being unsupported, the power of the appellate court begins and ends with a determination as to whether there is any substantial evidence, contradicted or uncontradicted, which will support the conclusion reached by the jury. When two or more inferences can be reasonably deduced from the facts, the reviewing court is without power to substitute its deductions for those of the trial court.' " (6 Witkin, Cal. Procedure (2d ed. 1971) Appeal, § 245, p. 4237.) "*Where the evidence is in conflict, the appellate court will not disturb the verdict of the jury . . . .*" (*Id.,* at p. 4236.) With these rules in mind, we will now discuss the propriety of: (1) the award of disability benefits; (2) the award of damages for claimed emotional distress suffered by reason of the Company's alleged bad faith; and (3) the exemplary damages award.

## I. *The Award of Disability Benefits*

The Company attacks the award of $33,600 in disability benefits to plaintiff, retroactive to May 1972 on three grounds: (1) the jury utilized the wrong test in deciding whether or not plaintiff was totally disabled; (2) there was no substantial evidence presented at trial that plaintiff was totally disabled before the lapse of coverage; and (3) disability benefits

---

[15]The policy provided for a maximum of seven years of disability payments, contingent upon continuing total disability. The jury's award included payments then due (up to February 1977) and those that would fall due in the future, i.e., up to May 1979.

covering a period after the rendition of the verdict should not have been awarded.[16]

■ As to the first ground, the jury was instructed, if they found that plaintiff was "rendered unable to perform the substantial and material duties of his occupation in the usual and customary way," that he was totally disabled. The Company argues that the jury should have been instructed strictly according to the terms of the policy which defined total disability as a condition wherein the claimant is prevented "from performing any and every duty pertaining to his profession . . . ." The definition in the instruction which was given was taken, verbatim, from *Bareno* v. *Employers Life Ins. Co.,* 7 Cal.3d 875 [103 Cal.Rptr. 865, 500 P.2d 889], wherein it was stated at pages 886-887, " 'According to the overwhelming authority, the term "total disability" does not signify an absolute state of helplessness but means such a disability as renders the insured unable to perform the substantial and material acts necessary to the prosecution of a business or occupation in the usual or customary way. Recovery is not precluded under a total disability provision because the insured is able to perform sporadic tasks, or give attention to simple or inconsequential details incident to the conduct of business.' " (Citing *Erreca* v. *West. States Life Ins. Co.,* 19 Cal.2d 388, 396 [121 P.2d 689, 141 A.L.R. 68].)

*Erreca* involved a general or nonoccupational policy. Under such a policy, benefits are paid out if the insured "is wholly incapacitated from . . . performing any work whatsoever for remuneration or profit . . . ." It protects the insured as a working individual, and not as a member of any particular profession or calling. In *Erreca,* the California Supreme Court ended years of controversy as to what the words "wholly incapacitated from performing any work whatsoever" meant. It decided that such a

---

[16]In his brief, plaintiff has included as an appendix a copy of a partial satisfaction of judgment, filed August 22, 1977, acknowledging receipt of $37,511.23 "representing that portion of the judgment for benefits which were due and owing under the policy of insurance in question including interest thereon up to July 29, 1977." With reference to this item, plaintiff in his brief states, "This obviously renders appellant's argument that there is no substantial evidence that Austero was totally disabled and entitled to benefits under the policy (including future benefits) as moot." By further statements in his brief on this point the plaintiff takes the position that the only issues viable on appeal are those arising under the award of damages for emotional distress and of exemplary damages. The partial satisfaction of judgment is not part of the record on appeal, and accordingly we shall proceed to consider all issues raised by the record before us. Otherwise, the application of *Reitano* v. *Yankwich,* 38 Cal.2d 1, 3 [237 P.2d 6], has not been demonstrated, for there is no showing in the record or otherwise that the partial satisfaction was achieved voluntarily.

phrase could not be given a strict, literal meaning. The court reasoned that it would be inequitable for a man who was trained to be a surgeon, for example, to be denied benefits under a general disability policy because he was still able to sell newspapers on the corner. Rather, the phrase was construed to entitle the insured to benefits whenever a disability " 'prevents his working with reasonable continuity in his customary occupation or in any other occupation in which he might reasonably be expected to engage *in view of his station and physical and mental capacity.*' [Citation.]" (*Erreca* v. *West. States Life Ins. Co., supra,* 19 Cal.2d 388, 394-395, italics added.)

As an entirely separate matter, the court in *Erreca* went on to consider what the term "total disability" meant, and it utilized the definition later stated in *Bareno*. The court added "the insured is not totally disabled if he is physically and mentally capable of performing a substantial portion of the work connected with his employment. He is not entitled to benefits because he is rendered unable to transact one or more of the duties incident to his business. [Citations.]" (*Id.,* at p. 396, citing, inter alia, *Dietlin* v. *Missouri State Life Ins. Co.,* 126 Cal.App. 15 [14 P.2d 331, 15 P.2d 188].)

The Company argues that occupational disability policies which insure the individual in his particular profession or occupation, such as the policy here, should not utilize the same test for total disability which is used in general or nonoccupational policies. Initially, it is interesting to note that in the *Bareno* case, where the "substantial and material duties" test was applied, we are not told whether the policy was occupational or general.[17] Despite this, the Supreme Court proceeded to impose the "substantial and material duties" definition.[18]

We see no reason for distinguishing between nonoccupational and occupational disability policies in terms of the definition of "total disability," nor has the Company given us reason to. The Company

[17]We might be able to guess that the policy was indeed occupational, because it was drafted by the employer, an insurance company, for its own employees.

[18]We also note that when setting forth the "substantial and material duties" test in *Erreca*, the court referred to an ALR note which cited as its authority a case involving an occupational disability policy.

Further support for this position can be found in *Hurwit* v. *Prudential I. Co. of America*, 45 Cal.App.2d 74 [113 P.2d 691], wherein the court explained that under some theories, nonoccupational policies are analogized to occupational policies in that, under both, the insured may recover upon proof that he is unable "to perform substantially all of the material acts necessary to [his profession]. [Citations.]" (*Id.,* at p. 81.)

concedes that the policy in question was designed "to provide income where the insured, because of his sickness, loses the ability to earn." Whenever such income substitution is a goal of an insurance policy, the courts of this state have preferred to give "total disability" a definition which "contemplate[s] the *substantial* doing of those things which are generally regarded as constituting performance of work and conduct of business, and not simply the sporadic doing of simple tasks, or the giving of attention to simple details . . . ." (*Hill* v. *New York Life Ins. Co.,* 38 Cal.App.2d 627, 633 [101 P.2d 752], italics added.)

Finally, the Company cites *Dietlin* v. *General American Life Ins. Co.,* 4 Cal.2d 336 [49 P.2d 590], as support for the proposition that the strict policy definition of "total disability" should be followed in occupational disability policy cases. *Dietlin* involved an occupational disability policy which provided total disability benefits if the insured was unable to perform " ' "any and every kind of duty pertaining to his occupation." ' " (*Id.,* at p. 341.) Partial disability benefits fell due if the insured was rendered unable to perform " ' "one or more important daily duties pertaining to his occupation." ' " (*Id.*)

The insured was a plastering contractor who performed " ' "[o]ffice, estimating and supervising duties only." ' " (*Id.,* at p. 340.) Following an injury, he was able to do everything he had before except climbing scaffolds and ladders, which was part of his duties. He argued, because he was unable to perform one of his material duties, that he was totally disabled. The court rejected his contention, concluding that because the insured was unable to perform one or more of his daily duties, he was only partially disabled. Thus, the terms of the policy were seemingly adhered to.

However, the facts in *Dietlin* differ markedly from those here. Here, plaintiff claims that he was unable to perform *all* the substantial and material duties of his profession; thus, he was totally disabled. He did not contend that he was totally disabled because he was unable to perform *a* substantial and material duty. *Dietlin* specifically addressed the former situation in stating that " 'after ability of the plaintiff to perform certain substantial portions of his daily duties had been admitted by plaintiff, proof that he could not perform certain other important portions of those duties was not relevant.' " (*Id.,* at p. 346.)

Finally, in *Erreca,* the Supreme Court in commenting on the holding in *Dietlin*[19] said, "In denying recovery of benefits for total disability, the court reasoned that the climbing of scaffolds did not constitute a *substantial* portion of his duties." (*Erreca* v. *West. States Life Ins. Co., supra,* 19 Cal.2d 388, 398, italics added.)

Through this progression of cases, it is clear that the California courts oppose strict adherence to a highly limited definition of "total disability" in both nonoccupational and general occupational disability policies. Such policies should offer protection to the insured when he is no longer able to carry out the substantial and material functions of his occupation. Common sense also dictates this. Certainly, it would be far beyond the reasonable expectations of an attorney covered by a disability policy, to discover, for instance, if he were still able to return a client's telephone call or Shepardize a case but do nothing else, that he would not be considered totally disabled. We find no error in the instruction which was given defining total disability.

■ Next, the Company contends that there was no substantial evidence that plaintiff was disabled at the time coverage lapsed on April 10, 1973.[20] On the one hand, there was evidence presented at trial that

---

[19]In *Erreca,* the court actually cites *Dietlin* v. *Missouri State Life Ins. Co., supra,* 126 Cal.App. 15. This constituted the opinion of the First District, Court of Appeal. In *Dietlin* v. *General American Life Ins. Co., supra,* 4 Cal.2d 336, the Supreme Court adopted that portion of the Court of Appeal's opinion which is discussed above. For our purposes, *Dietlin* v. *Missouri State Life Ins. Co.* and *Dietlin* v. *General American Life Ins. Co.* (Missouri State Life Ins. Co. changed its name to General American Life Ins. Co.) are one and the same.

[20]Plaintiff argues that *so long as the disease had its onset* during the effective life of the policy, he was covered, regardless of when he became totally disabled. He cites, in support, *Frenzer* v. *Mutual Ben. H. & A. Assn.,* 27 Cal.App.2d 406 [81 P.2d 197]. In *Frenzer,* the plaintiff was covered by a policy which provided for benefits for loss of life, limb or working time caused by accidental bodily injuries which immediately, and continuously disabled plaintiff from the accident date. Plaintiff accidentally hit himself in the hand with a hammer, and a metal particle became imbedded in his hand. Eventually, he died of blood poisoning caused by the presence of the particle. The company argued that plaintiff's beneficiary was not entitled to benefits under the policy because the accidental injury did not immediately, continuously and wholly disable plaintiff.

In construing the meaning of the " 'immediately and totally disabling' " requirement, the court said "the weight of authority is toward the so-called process of nature rule; that is, that when a disability follows from an accidental injury within such time as the processes of nature consume in bringing the affected person to the state of total incapacity . . . ." (*Id.,* at p. 413.)

It is evident from *Frenzer* that the "process of nature rule" is to be applied when the policy requires the disability to flow *immediately* from the injury. The case before us involves no such requirement. Here, it would do a great disservice to both parties to totally ignore the clear terms of the policy and the expectations of the parties, and to

plaintiff's workload greatly decreased during the 1971-1974 period. Plaintiff's secretary stated that he spent much office time doing things other than his professional duties. Wayne testified that in 1972 and 1973, plaintiff drafted no pleadings, wrote no briefs and did no legal research. We also have the medical testimony of Dr. Barth that in May 1972 plaintiff was suffering from "significant intellectual deterioration," and that, in his opinion, plaintiff could not read a case and draw legal principles from it. We also have the statements of Dr. van den Noort that plaintiff was incapable of acting as a competent attorney in July 1972, and that he encouraged plaintiff to continue working to maintain his spirits. However, Dr. van den Noort also noted that Wayne represented to the physicians examining his father that plaintiff was incapable of practicing law in 1972.

On the other hand, there was evidence that in 1972 and 1973, plaintiff appeared at a number of contested and uncontested matters from simple default divorces to contested order to show cause hearings, estate distributions and plea-bargain negotiations. In fact, in 1972, he appeared at 251 hearings, had 689 appointments with clients, and in 1973, had 113 hearings and 360 appointments with clients. Despite plaintiff's mental impairment, he seemed obviously able to perform at least *some* of the functions of his profession.

From the foregoing, it appears that there was a sharp conflict in the evidence on whether or not plaintiff was totally disabled, i.e., no longer able to perform the substantial and material duties of his profession. Applying the general rule we recited at the beginning of the discussion, when there is a conflict in the evidence, we cannot disturb the jury's verdict. Here, the jury specifically found that plaintiff was totally disabled beginning in May 1972. Because there is substantial evidence to support such a finding, we cannot disturb that determination.[21]

---

construe the policy to allow coverage merely because plaintiff's presenile dementia *began* before the policy lapsed on April 10, 1973.

[21]One of the Company's primary objections to the use of the "substantial and material duties" test was the test's reference to the performance of such duties "in the usual and customary way." The Company contends that the use of such language allowed the jury to find that plaintiff was totally disabled simply because he was not performing his duties in the same manner as he had before. However, it is clear from the evidence that plaintiff was simply not performing what the jury considered to be the substantial and material duties most attorneys perform, not that he was performing them in a different way. Hence, we are unpersuaded that error resulted from the use of the phrase.

■ Finally, under this first general point, the Company contends that the jury erred in awarding plaintiff "future" disability benefits, i.e., those which would fall due between the date of the verdict, February 18, 1977, and May 1979, the last date benefits could be claimed under the policy. The Company's point is well taken. In *Erreca* v. *West. States Life Ins. Co., supra,* 19 Cal.2d 388, the Supreme Court held, "Such a policy constitutes a continuing contract for periodic installment payments depending upon the insured's continued disability, and he has no cause of action, nor the insurer any liability, *except for benefits which have accrued."* (*Id.,* at p. 402, italics added.)

This rule makes sense. Plaintiff's right to collect is contingent on: (1) his remaining totally disabled; and (2) his remaining alive. Plainly stated, accepting that plaintiff has established a breach of contract based upon the Company's failure to pay benefits for his disability, such benefits are only computable to the date of the judgment. In other words, there is no such thing as a "future" benefit payable under the policy. Such an award as made in this instance erroneously compels payment of an amount not yet due and which may never become due.

The plaintiff's response to this and to the application of *Erreca* to this phase of the case is, while *Erreca* was a breach of contract case, that this is a tort case and that future damages *are* recoverable in tort cases. More particularly, plaintiff in his brief states "In California future damages are allowed in tort actions. Every contract of insurance contains an implied in law covenant of good faith and fair dealing; this convenant [*sic*] provides that neither party will interfere with the rights of the other to receive the benefits of the agreement. Violation of this duty is a tort."

There is a short answer to this contention. Accepting the proposition that a breach of the law-implied covenant of good faith and fair dealing present in every insurance policy is a tort, what plaintiff's argument ignores as a matter of causation is that it is *legally impossible* to breach a contract by refusing to pay benefits which have not yet accrued under the terms of the policy. As a consequence, the jury's award in this instance, as noted, compels payment of an amount not yet due and which may never become due. In other words, whether plaintiff chooses to argue that he is seeking recovery in contract or tort, there can be no tort in the absence of a breach of the duty to pay. As stated in *Gruenberg* v. *Aetna Ins. Co.,* 9 Cal.3d 566 [108 Cal.Rptr. 480, 510 P.2d 1032], "It is the obligation, deemed to be imposed by the law, under which the insurer must act fairly

and in good faith *in discharging its contractual responsibilities.*" (*Id.,* at p. 574, italics added.)

In the case before us, there was a special interrogatory submitted to the jury which it answered by saying that there was $33,600 due "under the policy." From this there can be no doubt that the jury sought to award seven years of benefits under the policy, even though five years only had elapsed since the onset of disability. This was error. Accordingly, we shall modify the judgment, insofar as it awards disability benefits due under the policy to reflect the amount properly recoverable under its terms, i.e., those due up to February 28, 1977.

## II. *The Award of Damages for Emotional Distress*

On verdict form "A" the sum of $67,200 was entered as compensatory damages. By means of interrogatories to the jury it was determined, as noted in the previous section of the opinion, that $33,600 thereof was found to be payable under the policy as disability benefits due from May 1972. The other $33,600 of the total compensatory damages award was found to be those damages recoverable for plaintiff's emotional distress suffered because defendant "breached its duty of good faith in denying the policy benefits to plaintiff[.]"

The Company challenges the correctness of the jury instruction on the nature of its duty in discharging the implied covenant of good faith and fair dealing: "Where an insurance company unreasonably denies or delays payment of benefits due under an insurance policy and does so without giving the insured's interests at least as much consideration as its own, the insurance company has breached its duty imposed by law of good faith and fair dealing. [¶] If you find defendant, NATIONAL CASUALTY COMPANY OF DETROIT, MICHIGAN, breached the duty of good faith and fair dealing with respect to the disability policy, then plaintiff, JULIUS S. AUSTERO, is entitled to recover all damage legally caused by said breach." This instruction informed the jury that to hold the Company liable for breach of the covenant of good faith and fair dealing it must find that the Company unreasonably denied or delayed payment of benefits due under the policy. As we shall explain, that is a correct statement of the law.

Notwithstanding that this instruction was given at plaintiff's request, plaintiff at oral argument, in addressing the issue of the sufficiency of the evidence to demonstrate that the refusal to pay benefits was unreason-

able, asserted that such proof was really unnecessary, i.e., that he was not required under the law to show that the Company unreasonably denied or delayed payment. Rather, plaintiff argued, when an insurer declines to pay policy benefits claimed by the insured, that it acts at its peril in terms of exposure to liability for damages in tort should it later be determined that benefits actually were due under the policy. This contention requires us, because of our later ruling on the sufficiency of the evidence, to consider and define the nature of the Company's duty in passing upon the plaintiff's claim.

■ As correctly reflected by the jury instruction quoted, it is now firmly established that every policy of insurance imports an implied covenant of good faith and fair dealing which enjoins upon each party to the agreement a duty that neither shall do anything which impairs the right of the other to receive the benefit of agreement. (*Liberty Mut. Ins. Co.* v. *Altfillisch Constr. Co.,* 70 Cal.App.3d 789, 797 [139 Cal.Rptr. 91].) As noted in the cited case, the presence of the implied covenant as a part of all insurance contracts coupled with its breach has been increasingly the source of spectacular jury awards based upon tort theory. More specifically, it is possible to accomplish a breach of contract by conduct also deemed tortious if such conduct embodies a breach of the implied covenant of good faith and fair dealing. However, the cases in which this basic principle has dictated the result are generally of two types.

A cause of action based upon the so-called theory of "bad faith"[22] against an insurer has to date been recognized in two situations. The first such situation in which a cause of action has come to be recognized is the "third party" case. Typically liability insurance is involved, and the behavior of the insurer which comes under scrutiny as allegedly tortious is the refusal to accept the third party's offer to settle his claim against the insured under circumstances of the particular case which make the refusal either reasonable or unreasonable.

There are certain refinements with reference to the kinds of situations arising in these third party cases as will be more fully discussed, but generally if the third party claimant has made a reasonable offer to settle within the policy limits, and, given the nature of the disclosures to the insured of the competent evidence of the personal or property injury, if the insurer acts unreasonably by giving unequal or insufficient considera-

---

[22]In our view the words "bad faith" are actually an imprecise label for what is essentially some kind of *unreasonable* insurer conduct, and such words serve only to obscure and oversimplify the rationale of the decisions in this broad subject-matter area.

tion to the interests of the insured and refuses to settle, and if then the third party recovers a judgment against the insured in excess of the policy limits, the cases hold the insurer liable for the full amount of the judgment previously recovered by the third party as well as for accompanying damages for emotional distress suffered by the injured, and, in appropriate cases, exemplary damages. (*Johansen* v. *California State Auto. Assn. Inter-Ins. Bureau,* 15 Cal.3d 9 [123 Cal.Rptr. 288, 538 P.2d 744]; *Crisci* v. *Security Ins. Co.,* 66 Cal.2d 425 [58 Cal.Rptr. 13, 426 P.2d 173]; *Comunale* v. *Traders & General Ins. Co.,* 50 Cal.2d 654 [382 P.2d 198, 68 A.L.R.2d 883]; *Northwestern Mut. Ins. Co.* v. *Farmers' Ins. Group,* 76 Cal.App.3d 1031 [143 Cal.Rptr. 415]; *Ivy* v. *Pacific Automobile Ins. Co.,* 156 Cal.App.2d 652 [320 P.2d 140].)

The second area of cases where the "bad faith" label has been attached is in the kind of cause now before us, a first party case. Typically, some form of casualty insurance is involved, i.e., sickness and accident, fire, uninsured motorist, or, as here, occupational disability insurance. In such a case, the contractual obligation of the insurer is to pay money directly to the insured, not to a third party, and to do so only if the terms and conditions for payment have been fulfilled.

In this kind of a case, if the insurer *unreasonably* refuses to pay, this is held to be a breach of the implied covenant of good faith and fair dealing, subjecting the insurer to liability in tort. (*Silberg* v. *California Life Ins. Co.,* 11 Cal.3d 452, 461 [113 Cal.Rptr. 711, 521 P.2d 1103]; *Gruenberg* v. *Aetna Ins. Co., supra,* 9 Cal.3d 566, 575.) Where such liability is imposed, the measure of damages, just as in the third party cases includes both economic losses and compensation for emotional distress, and, in appropriate circumstances, exemplary damages. (*Fletcher* v. *Western National Life Ins. Co.,* 10 Cal.App.3d 376, 404 [89 Cal.Rptr. 78, 47 A.L.R.3d 286].)

However, there are significant differences between the two kinds of cases. In assessing such differences it is imperative to keep in mind that the ultimate duty imposed is that arising under the implied covenant of good faith and fair dealing, namely that neither party will do anything to deprive the other of the *benefits of the agreement.* Therefore, to determine the nature and extent of a party's duty to act fairly requires a careful scrutiny of the kind of contractual obligation arising under the policy.

The contractual obligation of the insurer in the third party case is markedly different from that in the first party case. The fundamental

*contractual* duty of the insurer in the third party case is to pay such judgments as shall be recovered against the insured because of the insured's own tortious conduct. The law-imposed duty of the insurer arising by reason of the implied covenant of good faith and fair dealing is to accept reasonable offers by the third party claimant to settle within policy limits. This duty is measured by the risk to the insured that a judgment will be awarded against him in excess of the policy limits. (*Johansen* v. *California State Auto. Assn. Inter-Ins. Bureau, supra,* 15 Cal.3d 9, 15-16; *Comunale* v. *Traders & General Ins. Co., supra,* 50 Cal.2d 654, 659.)

In both *Comunale* and *Johansen,* the refusal to accept a reasonable settlement offer was implicit in the position taken by the insurer. It *denied* coverage. In denying coverage entirely the insurer necessarily projected a refusal to accept *any* reasonable third party settlement offer. Actually, in both cases there *was* a very modest offer by the third party claimant to settle the case against the insured.

As to such posture of the insurer, the *Comunale* court stated, "An insurer who denies coverage *does so at its own risk, and, although its position may not have been entirely groundless,* if the denial is found to be wrongful it is liable for the full amount which will compensate the insured for all the detriment caused by the insurer's breach of the express and implied obligations of the contract." (*Id.,* at p. 660, italics added.)

In *Johansen,* the holding in *Comunale* was reaffirmed, the court observing, ". . . an insurer's 'good faith,' though erroneous, belief in noncoverage affords no defense to liability flowing from the insurer's refusal to accept a reasonable settlement offer. [Fn. omitted.]" (*Johansen* v. *California State Auto. Assn. Inter-Ins. Bureau, supra,* 15 Cal.3d 9, 16.)

Moving on from the case where coverage is denied, we come to the case where coverage is accepted but a settlement offer within the policy limits is refused. In such a case it has been held that whenever it is likely that the judgment against the insured will exceed the policy limits, with the result that the most reasonable manner of disposing of the claim is a settlement which can be made within those limits, a consideration in good faith of the insured's interest requires the insurer to settle the claim. (*Crisci* v. *Security Ins. Co., supra,* 66 Cal.2d 425, 429.)

Elaborating on the theory of liability, the court in *Crisci* commented, "Liability is imposed not for a bad faith breach of the contract but for

failure to meet the duty to accept reasonable settlements, a duty included within the implied covenant of good faith and fair dealing." (*Crisci* v. *Security Ins. Co., supra,* 66 Cal.2d 425, 430.)[23]

From this it is evident, despite the refinements peculiar to these cases, that the ultimate test of liability for any alleged tortious breach of the implied covenant of good faith and fair dealing in third party cases is the reasonableness of the insurer's decision to reject the third party settlement offer. This clearly appears in *Crisci* where the court said, "In determining whether an insurer has given consideration to the interests of the insured, the test is whether a prudent insurer without policy limits would have accepted the settlement offer. [Citations.]" (*Crisci* v. *Security Ins. Co., supra,* 66 Cal.2d 425, 429.)

Turning again to *Johansen,* we find a recent pronouncement of the rule that a reasonableness test is to be the measure of liability and that no rule of absolute risk is to be applied. This assurance comes out somewhat obliquely but is nevertheless plain where the court says, "the only permissible consideration in evaluating the reasonableness of the settlement offer becomes whether, in light of the victim's injuries and the probable liability of the insured, the ultimate judgment is likely to exceed the amount of the settlement offer." (*Johansen* v. *California State Auto. Assn. Inter-Ins. Bureau, supra,* 15 Cal.3d 9, 16.) In other words, if a prudent insurer operating without policy limits would evaluate the case as likely to produce a judgment for a figure *less* than the offer, then it would not be unreasonable to refuse the offer even though the subsequent trial resulted in a judgment equal to or greater than the offer which also exceeded the policy limits. (Cf. *Northwestern Mut. Ins. Co.* v. *Farmers' Ins. Group, supra,* 76 Cal.App.3d 1031, 1053.)

Continuing our analysis of the differences between the two kinds of cases, we come to a further discussion of the first party cases. In the usual first party case the promise of the insurer is to pay money, *due under the policy,* to the insured upon the happening of the event, the risk of which has been insured against. The benefit contracted for by the insured is the

---

[23]Amicus curiae in *Crisci* urged upon the court the proposition that whenever an insurer receives an offer to settle within the policy limits and rejects it, the insurer should be liable in *every* case for the amount of any final judgment whether or not within the policy limits. In other words, there are those who would do away with any evaluation of the reasonableness of the settlement offer and impose a kind of strict liability rule regardless of the circumstances extant in connection with the offer to settle. While discussing this suggested rule, the *Crisci* court did not rely upon it, but instead went ahead on the evidence to hold the refusal to accept the settlement offer to be unreasonable.

availability of money promptly upon the happening of the event insured against, and when an insurer refuses unreasonably to make a payment of the benefits due under the terms of the policy, it deprives the insured of the essential benefit of the agreement. This follows, for the insured bargained for prompt payment, not a right of action against the insurer.

However, an insurer is not required to pay every claim presented to it. Besides the duty to deal fairly with the insured, the insurer also has a duty to its other policyholders and to the stockholders (if it is such a company) not to dissipate its reserves through the payment of meritless claims. Such a practice inevitably would prejudice the insurance seeking public because of the necessity to increase rates, and would finally drive the insurer out of business. Indeed, analysis of the leading first party cases demonstrates that a rule has never been applied which holds under any circumstances that an insurer which refuses to pay benefits claimed to be due under the policy did so at its own risk. Clearly, both logic and good policy dictate that no such rule ever be applied in first party cases. To confirm the foregoing we turn to discussion of the two most recent Supreme Court decisions dealing with first party cases.

In *Silberg*, the insurer denied coverage until it could be determined whether or not workers' compensation would cover the injury. This decision by the insurer was made because its policy included a clause providing for nonpayment of claims compensable by workers' compensation insurance. As a consequence of the denial of the claim, the insured went without insurance payments for two years, while awaiting the Workers' Compensation Appeals Board decision. In the interim, the insured was forced to borrow money to pay part of his hospital bills. Even so, most of his hospital and doctor bills went unpaid, and this forced plaintiff to change doctors in an effort to obtain continuing treatment. He ultimately lost his job and had to move his residence several times to avoid creditors. As a final blow, his wheelchair was repossessed and he could not afford to purchase painkilling medication.

The court, in reciting the facts which demonstrated the insurer's unreasonable conduct in handling the claim, stated, "[T]he . . . policy application declared in large, heavy type, 'Protect Yourself Against the Medical Bills That Can Ruin You.' Plaintiff's application . . . indicated that he had no other hospital or disability insurance . . . . Defendant was aware that plaintiff earned only a modest income and had incurred substantial medical and hospital bills. The company also knew that there was a serious question whether plaintiff would qualify for workmen's

compensation benefits . . . . [¶] There is no question that if defendant had paid the hospital charges and it was ultimately determined workmen's compensation covered the injury, defendant could have asserted a lien . . . to recover the payments it had made . . . . [¶] No explanation was advanced by defendant as to why it failed to adopt this course in order to vindicate the promise made in the application that the policy was intended to protect the insured against medical bills which could result in financial ruin." (*Silberg* v. *California Life Ins. Co., supra,* 11 Cal.3d 452, 461.)

Under the circumstances, the court found, as a matter of law, that by refusing to pay benefits the insurer had violated its duty of good faith and fair dealing implied in the policy, and that the trial court had abused its discretion in granting a new trial on the ground that the evidence was insufficient to support a finding that plaintiff was entitled to compensatory damages. (*Id.,* at p. 462.)

In *Gruenberg,* the Supreme Court reversed the dismissal of a cause of action brought by the insurer against the insured after the trial court sustained a demurrer to the cause. The court held sufficient to state a cause of action for breach of the duty of good faith the allegation that "defendants wilfully and maliciously entered into a scheme to deprive [plaintiff] of the benefits of the fire policies in that they encouraged criminal charges by falsely implying that he had a motive to commit arson, and in that, knowing plaintiff would not appear for an examination during the pendency of criminal charges against him, they used his failure to appear as a pretense for denying liability under the policies." (*Gruenberg* v. *Aetna Ins. Co., supra,* 9 Cal.3d 566, 575.)

In reading *Gruenberg* we see it as significant in assessing the nature of the duty here involved that the court, in commenting on the allegations above quoted, said "We conclude therefore that while the complaint is far from a model pleading, it does allege in substance a breach on the part of defendant insurance companies of their duty of good faith and fair dealing which they owed plaintiff. [Fn. omitted.]" (*Id.,* at p. 575.) Just before this statement, the court had observed that, "Accordingly, when the insurer unreasonably . . . withholds payment of the claim of its insured, it is subject to liability in tort." (*Id.,* at p. 575.) From this it is clear that the substance or gravamen of the wrong in these first party cases is an *unreasonable* refusal to pay benefits due under the terms of the policies.

From the foregoing it is clear that the unequivocal holding of *Silberg* and *Gruenberg* and the cases which rely upon them is that the ultimate test of liability in the first party cases is whether the refusal to pay policy benefits was *unreasonable*. When the rationale for the act-at-your-own-risk rule applicable in some third party cases is kept in mind, it becomes apparent that a similar rule could never be appropriately applied in first party cases.

With the reasonableness test thus gleaned from the leading first party cases, we turn to the evidence of the Company's handling of plaintiff's claim. At the outset we can say without reservation that the facts before us are readily distinguishable from *Silberg* and *Gruenberg* in terms of the nature and quality of the insurer's conduct and attitude toward the claim.

In evaluating the evidence to see if there was any unreasonable conduct by the Company, it is essential that no hindsight test be applied. The reasonable or unreasonable action by the Company must be measured as of the time it was confronted with a factual situation to which it was called upon to respond. In this vein what do we find?

First, the policy lapsed for nonpayment of premium on April 10, 1973. In December 1973 the plaintiff applied to the Company for major medical insurance coverage, and in that application he *affirmatively represented* to the Company that he was still engaged in the fulltime activities of his profession and was free of any illness.

The original claim was received in June of *1974*, and at that time plaintiff represented that he had become totally disabled in *September 1973*. The claim form indicated that the first symptoms of the disability were manifest in May 1971, but that the first treatment had not occurred until September 1973. Actually, plaintiff represented that he had ceased working on September 20, 1973.

As is customary on such forms, a portion thereof was to be completed by the claimant's attending physician, in this instance by Dr. O'Connor. Item 8 on the form called for a statement concerning the time "Patient was continuously totally disabled (unable to work)." In the blank provided for this information the doctor wrote "DNA" meaning "does not apply." Item 9 recited "Patient was partially disabled." Again the doctor wrote in "DNA." Item 10 stated, "If still disabled, date patient should be able to return to work." Again, the inscription was "DNA."

Despite the fact that the policy had lapsed more than a year earlier and also despite the incomplete nature of the medical data on the claim form, Mr. Commons, the Company's claims manager, ordered copies of plaintiff's hospital records. From these records a rapid mental deterioration was indicated as beginning in June 1973, still a date *after* the policy had lapsed.

Then in July 1974 Commons wrote to Dr. O'Connor and asked for an explanation of the "DNA" responses to the questions on the claim form in light of plaintiff's claim that he was totally disabled. A self-addressed and stamped envelope was enclosed, yet Commons never received a reply from Dr. O'Connor. Later in July of 1974 Commons wrote to plaintiff and told him, because all the data submitted to the Company up to that time indicated that any claimed disability had occurred after the policy had lapsed, that the claim had to be rejected.

Thereafter, Wayne Austero, the plaintiff's son, began to submit various medical reports. These included Dr. van den Noort's letter of August 6, 1974, in which he opined that in 1972 plaintiff was unable to function as a competent attorney. In Wayne's accompanying letter, he claimed for the first time that the onset of disability had occurred *before* the policy had lapsed.

Commons replied, noting the inconsistency between the claimed date of disability on the claim form and the new date. He asked plaintiff or Wayne to inform him where plaintiff last practiced law, which Commons considered an essential factor in the decision to deny or grant benefits. The Company never received this information. Commons also asked plaintiff to list the dates of treatments he had received by physicians for his condition because the policy terms required that the insured be "under the regular care and personal attendance of a legally qualified physician" before disability benefits were paid. Plaintiff never supplied this information, despite the fact that the policy clearly required the plaintiff to supply such proof, at most, within one year of disability. Finally, the letter called upon plaintiff to supply any information regarding plaintiff's condition which plaintiff felt would assist the Company in their *reconsideration* of the claim. Obviously, the Company had not turned a deaf ear to plaintiff's request for payment of benefits. A letter requesting the same type of information "which you think would be helpful in the consideration of Mr. Austero's claim" was sent to Dr. van den Noort.

Because plaintiff up to that time had failed to supply the Company with information as to his professional activities during the period of

claimed disability, Commons sought such information by means of a series of credit reports. Those reports, while indicating that plaintiff was totally disabled as of September 1974, were inconclusive as to plaintiff's earlier activities except that they did indicate that plaintiff's workload had decreased sharply even though he was still handling cases, going into court, and interviewing clients.

Commons then received more medical documents, among which was Dr. Barth's conclusion that in 1972 plaintiff had experienced "significant intellect[ual] deterioration." Included with these reports was a letter from Wayne indicating that plaintiff's disability had brought "extreme financial difficulties and . . . emotional harm" to his family.

Commons responded, asking for clarification of some illegible language on two of the medical reports. Commons brought to Wayne's attention that plaintiff had, in December 1973, applied for major medical insurance and represented to the Company that he was still engaged in the fulltime activities of his profession and was free from any illness. Commons reminded Wayne of his earlier request that plaintiff inform the Company when he last practiced law and when he received medical treatment for his condition. Commons again asked Wayne to submit such information. Again, no response was made to the Company.

In turning the Austero file over to Claims Director Noonan, Commons made reference to Wayne's remarks regarding the financial and emotional problems experienced by his father and family. Commons alerted Noonan to the possibility of a suit brought by the Austero family based on this claim, and noted that plaintiff had similarly sued his other disability insurer, Washington National Insurance Company.

Thereafter, Noonan received a second letter from Dr. van den Noort concerning plaintiff's condition. While stating his opinion that plaintiff was incapable of practicing law in July 1972, he noted that "the major complaint . . . was derived from [plaintiff's] son who *made representations to physicians that his father was unable to competently continue the practice of law at that time.*" (Italics added.)

At trial, Noonan indicated that he failed to consult another physician about plaintiff's claim, but he recognized the Company's duty to give plaintiff's interest as much weight as its own, and felt, in good faith, that the Company was correct in rejecting plaintiff's claim. He indicated that the only doctor who actually expressed the opinion that plaintiff could not practice law in 1972 was Dr. van den Noort. Noonan commented that

he did not credit the doctor's opinion with sufficient weight to counter-balance the several other factors which justified denial of benefits. In any event, it is clear that Noonan did not *ignore* the doctor's opinion, but in good faith evaluated it as not having enough weight to overcome the reasonable if not compelling considerations militating against payment.

Finally, Noonan stated that in the hypothetical situation of a worker with a severely injured hand, the Company would pay the worker's disability claim upon a physician's report and periodic reports as to the claimant's activities. However, an external physical injury is objective in nature. It is relatively easy for a doctor to look at a man's injured hand, and, with proper testing, decide if that man has the manual dexterity to lift objects, drive a car or do whatever his occupation calls for. Conversely, whether the existence of a mental affliction, especially one which is progressive, as is presenile dementia, incapacitates one from performing that elusive collection of duties known as "the practice of law," is a highly subjective question.

We have reviewed again the evidence of the Company's handling of the plaintiff's claim in detail to demonstrate that this is not even a "close" case. We can observe with conscientious assurance that there was no evidence, not even an implication, that the Company acted unreasonably in denying the claim. The plaintiff's policy had lapsed, and finally the only medical opinion that plaintiff was totally disabled was to be found in the second letter from Dr. van den Noort. Even in this letter the doctor derived this opinion from the statements made to him by the plaintiff's son. On the other side were the extensive indications that the plaintiff was still practicing law through 1973.

From the foregoing evidence there is nothing in the Company's handling of plaintiff's claim and in their refusal to pay it which demonstrates the kind of unreasonable conduct condemned in *Silberg* and *Gruenberg*. Instead, there was a continuing effort by the insurer, via requests for information directed to the plaintiff which went unanswered, and, finally credit reports, to determine if plaintiff performed the substantial and material duties of his profession in 1972 and 1973. We also note the openness with which the Company apparently viewed plaintiff's claim as demonstrated by their efforts to seek more information from several sources and *reconsider* plaintiff's claim at various times.

██  In sum we hold as a matter of law that the conduct of the Company in handling plaintiff's claim here was eminently reasonable and did take into account equally and fairly both the interest of the

insured and the insurer. Therefore, we must reverse the award of damages for emotional distress.[24]

### III. *The Award of Exemplary Damages*

■ Although an insurer improperly withholds payment on a claim, or even breaches its duty of good faith and fair dealing toward its insured by means of unreasonable handling of the claim, it does not follow that it is automatically liable for exemplary damages. (*Silberg* v. *California Life Ins. Co., supra,* 11 Cal.3d 452, 462.) To be entitled to such damages, the insured must prove that the insurer acted wilfully, maliciously, and with intent to vex, annoy or injure.[25] In light of what we have said in the preceding section of this opinion, we must conclude that there was no evidence whatsoever to support the jury's award of exemplary damages.

### DISPOSITION

■ A judgment may be reversed in part where the error committed "has affected the determination of but one or more of a greater number of distinct and severable issues . . . ." (*Gray* v. *Cotton,* 166 Cal. 130, 139 [134 P. 1145].) "The most important application of this power is in cases where the judgment on liability is clearly right, but error is found in the verdict or decision on the amount recoverable." (6 Witkin, Cal. Procedure, Appeal, § 559, p. 4499.)

The judgment awarding disability payments due under the policy is modified by reducing the amount thereof to $23,200. As modified, that portion of the judgment is affirmed. In all other respects the judgment is reversed. Each party shall bear its own costs on appeal, except that defendant shall recover from the plaintiff its costs for any premium paid for a stay bond on appeal.

Kaufman, Acting P. J., and Morris, J., concurred.

---

[24]We must observe that nowhere in the record is there any evidence that the symptoms of plaintiff's depressed mental state were *caused* by the refusal to pay benefits. Actually, there was no showing that plaintiff was even aware that the Company had refused to pay the claim which had been submitted by his son.

[25]Plaintiff argues that the Company "consciously ignored the . . . medical evidence," and, under *Little* v. *Stuyvesant Life Ins. Co.,* 67 Cal.App.3d 451 [136 Cal.Rptr. 653], he is entitled to punitives. First, the only doctor who actually expressed the opinion that plaintiff *was disabled from the practice of law* in 1972 and 1973 was Dr. van den Noort. Mr. Noonan testified that he did not *ignore* the doctor's opinion, but did not give it sufficient weight to counterbalance the contrary evidence (e.g., the number of plaintiff's court appearances and client appointments during those years). This does not indicate action with malice or an intent to vex, annoy, or injure.

A petition for a rehearing was denied September 7, 1978, and the following opinion was rendered:

**McDANIEL, J.**—After our initial opinion had been filed, the plaintiff filed a petition for rehearing. In response to our stated position on the nature of the duty of an insurer in first party cases, the plaintiff in his petition took exception and stated, "In short, when an insurer decides to withhold payment on the policy of insurance it precedes [*sic*] at its own risk," citing *Johansen* v. *California State Auto. Assn. Inter-Ins. Bureau,* 15 Cal.3d 9 [123 Cal.Rptr. 288, 538 P.2d 744], and *Comunale* v. *Traders & General Ins. Co.,* 50 Cal.2d 654 [328 P.2d 198].

*Johansen* and *Comunale* were third party cases, and their citation by plaintiff in the case now before us for the proposition above noted represents precisely the kind of unjustified application of such a rule in first party cases which plaintiff urged at oral argument. We were at pains in our initial opinion to discredit any such illogical extension of the "deny at your own risk" rule to first party cases. However, if there remained any doubt that the measure of the insurer's duty in first party cases is one of reasonableness, such doubt was laid at rest by the decision of the Supreme Court in *Neal* v. *Farmers Insurance Exchange* (1978) 21 Cal.3d 910 [148 Cal.Rptr. 389, 582 P.2d 980], wherein the court discussed the holding in *Gruenberg* v. *Aetna Ins. Co.,* 9 Cal.3d 566 [108 Cal.Rptr. 480, 510 P.2d 1032]. (*Id.,* at p. 920.)

In *Neal* the Supreme Court clearly reaffirmed that "the duty of the insurer [is] to act fairly and in good faith in handling claims submitted *by* its insured," and " 'not to withhold unreasonably payments due under a policy.' " (*Neal* v. *Farmers Insurance Exchange, supra,* 21 Cal.3d 910, 920.) To make it clear that it was applying a test of reasonableness and not a rule of "deny at your own risk," the court went on to evaluate the evidence of the insurer's handling of the claim. If the court in *Neal* had been applying the rule as mistakenly construed by the plaintiff, there would have been no need to make an evaluation of the evidence bearing on the insurer's conduct in handling of the claim.

Kaufman, Acting P. J., and Morris, J., concurred.

Respondent's petition for a hearing by the Supreme Court was denied November 24, 1978.