[Civ. No. 11331.   Third Dist.   Jan. 12, 1967.]

MAUDE RHODA RICE et al., Plaintiffs and Respondents, v. SOUTHERN PACIFIC COMPANY, Defendant and Appellant.

Millington & Millington and Seth Millington for Defendant and Appellant.

Jack Ormes and Charles A. Skow for Plaintiffs and Respondents.

PIERCE, P. J.—Defendant Southern Pacific Company appeals from an adverse judgment in a wrongful death action brought by the widow and children of Wilford Lee Rice who was killed when the vehicle he was driving was struck by a train. Judgment was after a court trial.

We reject the contentions of defendant railroad that as a matter of law (1) it was not negligent, and (2) that decedent was guilty of contributory negligence.

In stating the facts we, of course, observe the rule that all

conflicts in the evidence are binding upon a reviewing court, and all reasonable inferences must be drawn in favor of respondents.

The accident occurred January 22, 1962, at 2:10 p.m. It was a crossing accident, approximately within the heart of Gridley. (The railroad depot is less than a block south.) Decedent was driving easterly along Hazel Street, one of the community's principal east-west paved thoroughfares. The north-south railroad tracks cross at street level. Rice was struck by defendant's northbound freight train consisting of 91 cars and traveling at 60 miles an hour. The train had not decreased its speed in any respect during its progress through town. The pickup which decedent was driving became impaled upon the locomotive of the freight train and was carried for a distance of more than a mile before the engineer was able to bring the train to a stop. Two other eastbound vehicles had crossed the track ahead of Rice, one of these vehicles having just passed Rice's pickup and crossed the tracks immediately before decedent was struck.[1]

The crossing was guarded by electric wigwag signals equipped with bells. The signals were working and the bells ringing at the time of the accident. That fact must be considered in the light of another set of circumstances: The bells on the signals frequently rang (with the wigwags swinging) when no trains were approaching or crossing through Gridley. Those circumstances occurred when repair and maintenance work was being performed on the tracks and switches. At such times defendant did not deactivate its wigwags. Sometimes the bells rang continuously for over an hour at a time. The evidence showed that the railroad knew the position at all times of all northbound and southbound train traffic. No explanation was given as to why the wigwags were not deactivated during repair work when no trains were in the vicinity. On and before the day of the accident, and prior to the fatal

---

[1]The testimony is that of Alan Campbell, a building contractor, who observed the accident from a block away. He was eating his lunch while seated in his truck, when the accident occurred. He testified: ''I believe there was a car out, quite considerably out in front, and there was a car right in front of the pickup that was hit. . . . I did not see the first car that passed over, crossed over the intersection. The car that was immediately in front of the vehicle that was hit had passed the vehicle that was hit just prior to reaching the tracks. He had just completed his passing in front of that, at that time.'' In answer to a question by the court the witness testified: ''It appeared to me that he had completed passing just as he was on the track, the vehicle immediately in front of this one that was hit.''

crash, a switch was being installed several blocks south of the Hazel Street crossing. This work had been in progress for a week or so. During these periods the conditions described existed. As one witness expressed it—the bells were ringing ''quite a bit.'' It is inferable that decedent knew of this condition; had probably passed that way four times earlier that day.[2] A short time before this accident the work had been discontinued on the switch and until the approach and passing of this train, the signals were still and the bells silent.

The evidence conflicts as to whether the train whistle was sounded before the accident and, if it was, at what point. Of plaintiffs' witnesses, one, Burl Pendergast, seated in a car with windows closed, heard *no* whistle. Another, Alan Campbell, remembered one blast of the train whistle which seemed to have been sounded when the train was passing Libby's Cannery, five blocks south of the scene of the accident. Campbell who was in the open at the time he heard the whistle had had time to walk across the street and get into his car before the accident happened. Asked, ''did you hear the whistle sound again at any time?'' he replied, ''Not that I recall.'' Harold Green, a newspaper linotype operator (whose office was a block away) who had gone to the scene of the accident immediately after the crash, recalled no train whistle but placed no significance upon his failure to remember whether it had been sounded or not. Of the Southern Pacific employees who were witnesses, one, a gang foreman, heard a whistle when the train was approaching Locust Street (the site of Libby's Cannery), also he heard the whistle blow for Magnolia Street, a block north. Asked: ''Q. And did you hear him [blow] after that?'' he answered, ''No. The train noise obliterates the sound. . . . [A]fter a train goes by you so far, you can't hear the whistle.'' The testimony of engineer Patterson and fireman Hale was that the whistle had been sounded continuously from 3,000 feet south of town all the way through Gridley.

The testimony of the witnesses unemployed by the railroad as to the sounding of a whistle can be reconciled. There was a

[2]The Rices lived on a small farm about 5 or 6 miles north and east of Gridley. Rice had driven from his home to town a few hours before the accident. He had returned home for lunch and had then driven back to Gridley. The most direct route on these occasions would have either been along Hazel Street and across the tracks or along one of the two streets immediately to the north or south, both crossing the tracks, both served by signals operated at that time in the identical haphazard fashion as the signals guarding Hazel Street.

north wind blowing which was described by one witness as "howling." The testimony of the engineer and of the fireman cannot be reconciled with that of the others. For the purposes of this appeal we must assume that if the whistle was sounded at all it was not sounded closer to the crossing involved in the accident than at a point five blocks to the south. The matter of credibility was for the trier of fact, the trial judge.

Decedent was blind in his right eye, a partial explanation for his failure to have seen the approaching train since he would have to turn his head to see it. In addition, his view was partially obscured by shrubbery and trees of a city park located at the southwest corner of the intersection of Hazel Street with the tracks. Photographs in evidence taken a day after the accident show these trees and shrubbery. A parked vehicle, or vehicles, on the south side of Hazel Street may have tended to obstruct the view. There was testimony that from 50 to 75 feet back (westward) from the tracks, a view of the tracks would be impaired until a driver reached a point 12 feet from the crossing. Appellant depreciates the testimony showing obstructions to view. Its brief states: "[T]he few trees in the park to the South were not an obstruction to the view of any person who had the energy to turn his head to look in the direction from which the train would be coming." The fireman in the cab of the locomotive testified (at his deposition) that he had not seen decedent's pickup until it was 20 feet (at the trial he said 50 to 75 feet) from the tracks. At that point the front of the locomotive, he said, was 150 feet south of the point of impact. His point of observation (the cab of the engine) was materially better than Rice's. The import of his testimony was that he was watching carefully for objects ahead. What impaired *his* view?[3] In this opinion the presence of the trees, shrubbery and parked cars cannot properly be stressed as a factor upon which the court's finding of negligence hinges. The court in its memorandum opinion did not consider them "of sufficient moment to make it *impossible* to see an approaching train," and although it is the court's findings and not its opinion upon which a reviewing court must rest its decision, the opinion is helpful as an aid to the trial court's reasoning, and it is obvious that the trial court did not consider the obstructions a determinative factor. (Emphasis is supplied.) It is properly to be noted, how-

---

[3]He testified there was a building obstructing his view. (In the photographs in evidence, we find no such building.)

ever, that when appellant railroad understates the existence of the trees, shrubbery and parked cars as being a negligible factor it seems to us to be disparaging the credibility generally of its own witness, Mr. Hale, the fireman.

Campbell testified the Rice pickup was traveling very slowly when it crossed the track. The fireman, Hale, stated it was traveling between 25 and 30 miles per hour.

### RE THE NEGLIGENCE OF THE RAILROAD

The railroad contends the facts related establish "as a matter of law" that it was not negligent. A question of law is determined "by reference to the body of statutes, rules, principles and precedents which make up the law." (Prosser on Torts (2d ed.) p. 192.) Questions of law are determined by courts. They are to be distinguished from questions of facts which depend upon the evidence. "If the evidence is such that no reasonably intelligent man would accept it as sufficient to establish the existence of a fact essential to negligence, it becomes the duty of the court to remove the issue from the jury. . . ." (*Idem*, pp. 191-192.) The existence of negligence in a particular case is sometimes said to be a mixed question of law and fact. Dean Prosser (*id.*, pp. 191-194) states five questions to be answered in negligence cases. It is the function of the court to determine some of them; others are to be determined by the jury (or by the judge, as trier of fact, if there is no jury). ▆ Also stated by Prosser (*idem*, p. 194) is a sort of "shorthand" rule which will suffice here: "[I]f men of reasonable intelligence may differ as to the conclusion to be drawn, the issue must be left to the . . . [trier of fact]; otherwise it is for the court."

No statute has been cited to us imposing special duties on railroads under the circumstances of the case before us. ▆ Their common law duty in approaching crossings is that "which any one else must exercise in any other situation to avoid the imputation of negligence, to wit, that care which would be exercised by a reasonably prudent man under the same or similar circumstances." (3 Blashfield, Cyclopedia of Automobile Law and Practice, § 1701, p. 58.) "On the one hand, when a railroad acts in the usual and customary manner in which trains are operated under analogous facts, the conduct in so acting cannot be characterized as negligence. On the other hand, at each public crossing, the railroad company must use care reasonably sufficient to give notice and warning of the movement of its trains and cars to the public having the right to use the crossing and to prevent the inflic-

tion of injury by reason of any lack of care in the management and operation of such trains and cars. . . ." (*Idem,* § 1701, pp. 59-60.) The "reasonably prudent person" test applies also to the speed at which a train approaches and passes a crossing, and material in the application of that test is "that no unnecessary risk shall be cast upon the public" considering the "location and surroundings" of the crossing involved. (*Idem,* § 1709, p. 78.) Specially mentioned is a "crossing in a thickly populated community and extensively used." The text also states: "[T]his factor is one of considerable importance heightening the likelihood of injury and correspondingly increasing the need for caution. . . ." (*Idem,* p. 79.) In section 1716 (*idem,* p. 97) under the caption, "Bells, Wigwags, and Similar Signals," the obligation of the railroad to use ordinary diligence to keep them in working order, to give notice that they are not working and to "use reasonable care with respect to such safety devices so that they will operate normally" are mentioned. Particularly noted is the fact that "Automatic or mechanical devices of that sort while serving at some times as warnings, at others serve as assurances of safety."

Before moving on to the specific cases cited by the parties respectively, we observe the following cautionary observation by Dean Prosser: "A decision of an appellate court that under certain circumstances particular conduct is negligence, or that it is not negligence, or that the question is for the jury, may establish a precedent for similar fact situations, and to that extent define the standard of conduct. But such decisions are not controlling where the facts are essentially different; *and the attempt to reduce negligence to inflexible rules of law has nearly always been unsuccessful.*" (Italics supplied.) (Prosser on Torts (2d ed.) § 40, p. 195.)

*Coe* v. *Southern Pac. Co.,* 203 Cal.App.2d 509 [21 Cal.Rptr. 731], the only case cited by the railroad on the issue of its negligence does not help its cause. To the extent it has any value as precedent it aids plaintiffs. There a defense verdict was returned in a railroad crossing case in which the operation of a wigwag was involved. The judgment was reversed. Reversal was upon grounds not here important. But the court found the error constituted a miscarriage of justice. The reviewing court could not have made that finding without reasoning that the question of the negligence of the railroad (under the facts of the *Coe* case) was a question of fact for the jury.

In *Lindsey* v. *Pacific Electric Ry. Co.* (1931) 111 Cal.App. 482 [206 P. 131], cited by both parties, a plaintiffs' judgment in a crossing wigwag case was affirmed. Due to a mechanical defect the wigwag operated continuously. This condition had existed for three or more days prior to the accident. Decedent was familiar with this defect. Dictum in the case states (on p. 488): "We are of the opinion that the fact that the wigwag and crossing bell were out of order so that they were in continuous operation regardless of whether or not a train was approaching, is of little importance in this case." (Judgment was affirmed upon grounds not here involved.)

The trial court in the case before us expressed a different opinion. It stated in a memorandum opinion: "[T]he continuous operation of the wigwag did create a dangerous situation apt to induce a motorist who had had occasion to previously traverse the crossing to be less careful and to assume from the very fact of the continued wagging and clanging of the signal *that repairs were still in progress and the right of way still not in use by a train*. Further, the repeated clanging . . . under such circumstances would tend to obscure and to reduce the impact of warning bells or whistles from the train. The maintenance of such a condition is negligence." (Italics supplied.) A California case, *Startup* v. *Pacific Electric Ry. Co.*, 29 Cal.2d 866, 869 [180 P.2d 896], holds that a railroad operating a wigwag is under a duty to use reasonable care in the maintenance thereof "lest the appearance of safety created by the presence of the device constitute a trap for persons relying upon it for protection." But that was a case where the signal was so maintained that it stopped too quickly after a first train passed. Cases in other jurisdictions support the trial court's position in the case before us. One of them, *Wabash Ry. Co.* v. *McNown* (1912) 53 Ind.App. 116 [99 N.E. 126], presents facts quite closely analogous. (However, a horse-drawn hack instead of an automobile was involved.) The train there was running at 35 to 40 miles per hour (as compared with 60 miles per hour here). Visibility in the approach of the track was partially obstructed. An electric warning bell was out of order and as a result rang continuously. It was held (1) that the speed of the train as constituting negligence *was a question of fact for the jury*; (2) that the railroad, having voluntarily maintained a wigwag and bell at the crossing in question, "the traveling public had the right to rely upon it to the extent of presuming that it would correctly indicate the danger or serve the warning which it was

intended that it should give. [Citations.]'' (99 N.E. at p. 129.)

We need not enter the lists to champion the proponents either of the theory that a known continuous ringing of a bell is unimportant or those who maintain that it is. It is to be noted in the instant case that, as the trial court stated, the swinging of the signal and the ringing of a bell might reasonably be said to have become associated with an open switch being worked upon, during which period a train would not be expected to pass. ▌ But, in addition to the continuously ringing and swinging signal, a number of other factors were sufficient to make this a case to be determined by a fact finder. Those other factors are: (1) the fact of a 91-car freight train traveling through a well-populated community at 60 miles per hour, together with (2) the absence or inadequacy of the sounding of the train whistle, coupled with (3) the known fact that a severe north wind would not only carry sound over the air *away from* traffic crossing ahead but (4) would tend to cause motorists to drive their vehicles with windows raised.

### Re the Question of Contributory Negligence

▌ Rice is dead. It is a disputable presumption that a person takes ordinary care of his own concerns (Code Civ. Proc., § 1963, subd. 4). In *Smellie* v. *Southern Pac. Co.*, 212 Cal. 540 [299 P. 529], an action for wrongful death involving a railroad crossing accident, the presumption of that code section was held to constitute *evidence* in favor of decedent not dispelled by proof by an adverse party controverting the presumption. The presumption itself was held sufficient to justify a plaintiffs' judgment. The rule of *Smellie, supra,* often criticized, remained the law (see Witkin, California Evidence (1958) pp. 122-124, and cases cited) until the effective date of the new Evidence Code, section 600, subdivision (a), which changes it. (See Witkin, Cal. Evidence (2d ed. 1966) p. 197.) Presumption-as-evidence was, therefore, the rule when this case was tried and it is applicable. That alone was sufficient to take the case to a jury (here the court as trier of fact) on the issue of contributory negligence.

But more than a presumption necessitates our rejection of the railroad's claim of contributory negligence as a matter of law. ▌ The same facts which in combination, as we have shown above, justify a finding of negligence against the railroad also lend support to a finding of no negligence on the part of Rice under the circumstances of this case.

■ "'[O]ne to whom a duty of care is owing by another has the right to assume that the person who owes such duty will perform it; and in the absence of reasonable ground to think otherwise, it is not negligence on the part of the one to whom the duty is owing to assume that he will not be exposed to a danger which can come to him through a violation of that duty by the person owing it.'" (2 Witkin, Summary of California Law, Torts (1960) § 333, p. 1532; see also *Amendt* v. *Pacific Electric Ry. Co.*, 46 Cal.App.2d 248, 256 [115 P.2d 588].) Significant in Rice's assumed but misplaced reliance upon the railroad's performance of its duty towards him is the fact that another vehicle immediately ahead of Rice also, according to plaintiffs' evidence, relied upon it, and but for a fractional second of time—and perhaps the grace of God—would have joined Rice in death. Or so the trier of fact could have determined.

Authorities in other jurisdictions also support the position taken by the trial court on the issue of contributory negligence. A note in 13 American Law Reports 949 collects them. ■ The note says: "Contributory negligence cannot be predicated on the disregard of a safety appliance, such as a crossing gate or an automatic bell, or on a failure to await its complete operation, if the plaintiff, at the time of such disregard or failure, knows that the safety appliance is not reliable." (See particularly among the cases cited in that note (pp. 949-950): *Wells* v. *Baltimore & O.S.W. Ry. Co.*, 153 Ill.App. 23; *Cincinnati, N.O. & T.P. Ry. Co.* v. *Champ*, 31 Ky. L.R. 1054 [104 S.W. 988]. See also 44 Am.Jur., Railroads, § 536, pp. 785-786, and cases there cited.)

Hereinabove the question of Rice's alleged contributory negligence has been discussed on the basis of common law liability. No statutory duty was apparently brought to the attention of the trial court. At any rate, none is mentioned in the opinion or in the findings—or on appeal. We call attention in the interests of completeness to Vehicle Code section 22451, subdivision (a), which, as amended in 1961 and in effect when this accident occurred, provides that whenever "a clearly visible electric or mechanical signal device gives warning of the approach of a railway train" a driver of a vehicle about to cross must stop at distances specified and wait until it is safe to pass. An unexcused failure to comply with a statute of course raises a presumption of negligence. (*Alarid* v. *Vanier*, 50 Cal.2d 617 [327 P.2d 897]; 2 Rest.2d Torts, § 286.)

■ It is a general rule that an appellate court will ordinarily

not consider a matter of this sort when the question was not raised before the trial court. (Here the violation of the statute is not even raised before this court.) *Dimmick* v. *Dimmick,* 58 Cal.2d 417, 422 [24 Cal.Rptr. 856, 374 P.2d 824] ; *Dolske* v. *Gormley,* 58 Cal.2d 513, 518 [25 Cal.Rptr. 270, 375 P.2d 174] ; *Miller* v. *Webb,* 217 Cal.App.2d 36, 39 [31 Cal.Rptr. 521] ; *Design Associates, Inc.* v. *Welch,* 224 Cal.App.2d 165, 171 [36 Cal.Rptr. 341] ; 3 Witkin, California Procedure, Appeal, § 94, p. 2261.) There are exceptions to the rule stated not applicable here. (*Lewis & Queen* v. *N. M. Ball Sons,* 48 Cal.2d 141, 147-148 [308 P.2d 713].) The wisdom of the rule is illustrated by the case before us. Defendant railroad produced evidence that decedent did not stop. Plaintiffs' witnesses, although testifying Rice was driving very slowly when he crossed the tracks, did not give evidence as to whether they had seen him stop or not. ■■■ The presumption of due care would carry with it the presumption that the statute had been complied with. (*Sharick* v. *Galloway,* 19 Cal.App.2d 693, 696 [66 P.2d 185] ; *Chambers* v. *Spada,* 133 Cal.App.2d 231, 234 [283 P.2d 1067].) The statute does not apply unless the signal is *clearly* visible and unless it is *actually giving a warning.* The evidence in this respect is conflicting. It would be decidedly unfair both to the trial court and to the plaintiffs for us to attempt to apply the statute here. Moreover, even if we were willing to do so, we could not say that Vehicle Code section 22451, subdivision (a), had here been violated as a matter of law.

■■■ On the basis of both the presumption of due care and the evidence hereinabove discussed, the question of contributory negligence, like the question of the railroad's negligence, was one of fact for the trier of facts. We so hold.

The judgment is affirmed.

Regan, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied March 8, 1967.