[Civ. No. 67241. Second Dist., Div. Three. Dec. 27, 1983.]

ANNETTE PAULFREY, Plaintiff and Respondent, v.
BLUE CHIP STAMPS et al., Defendants and Appellants.

188

[]

## COUNSEL

Burke, Williams & Sorensen, Richard R. Terzian, Gibson, Dunn & Crutcher, John J. Swenson, Sherrill L. Johnson, Kight & Sutton and James M. Sutton, Jr., for Defendants and Appellants.

Stockdale, Peckham, Estes & Werner and David C. Werner for Plaintiff and Respondent.

## OPINION

**KLEIN, P. J.**—Defendants and Appellants Aetna Life Insurance Company (Aetna) and Blue Chip Stamps (Blue Chip) appeal from a judgment awarding plaintiff and respondent Annette Paulfrey (Paulfrey) compensatory and punitive damages for bad faith breach of an insurance contract.

The trial court improperly granted Paulfrey's motion for a directed verdict; we therefore reverse the judgment and remand the case for further proceedings.

## Factual and Procedural Background

The crucial three causes of action on which this case went to trial alleged bad faith breach of an insurance contract. The first cause alleged that Paulfrey filed a claim on Aetna's form through Blue Chip within 90 days after the accident and that representations were made that her bills would be paid. In March 1976, Aetna advised her for the first time that her claim was denied because she failed to file written proof of loss.

The second cause incorporated the first, and added an alternative that even if Paulfrey did not comply with certain requirements of the Aetna policy, those requirements were waived.

The third cause alleged that Paulfrey had properly filed her claim with Aetna through Blue Chip and that Blue Chip negligently misplaced, lost or mismanaged her application for insurance benefits.

The trial was bifurcated, with liability being tried first. At the close of the liability phase, the trial court granted Paulfrey's oral motion for directed verdict on the basis that both Aetna and Blue Chip had violated the insurance contract's implied covenant of good faith and fair dealing by failing to investigate her claim.

The jury returned a verdict against Blue Chip and Aetna jointly for compensatory damages in the amount of $59,160, against Blue Chip for punitive damages in the amount of $58,160 and against Aetna for punitive damages in the amount of $500,000. After Aetna and Blue Chip's motion for a new trial was denied, the instant appeal ensued.

## Contentions

Both Aetna and Blue Chip challenge the propriety of the directed verdict, contending there was substantial evidence sufficient to support a verdict in their favor because there were either major conflicts in the evidence or the evidence was uncontroverted in their favor.

## Discussion

1. *A breach of the implied covenant of good faith and fair dealing inherent in every insurance contract results in a tort.*

(a) *The test of a breach is reasonableness of insurer's conduct.*

The trial court ruled as a matter of law that Aetna and Blue Chip breached their duty of good faith and fair dealing with Paulfrey by, first, negligently

mishandling, misplacing or losing her application for benefits; secondly, by failing to investigate her claim; and, thirdly, by failing to notify Paulfrey of the deficiencies in her claim. The trial court granted Paulfrey's motion for a directed verdict on these bases.

We find that the trial court erred because there were questions of fact for the jury to resolve.

■ *Austero* v. *National Cas. Co.* (1978) 84 Cal.App.3d 1, 26 [148 Cal.Rptr. 653], accepts the premise that a breach of the implied covenant of good faith and fair dealing present in every insurance policy is a tort, and the court therein goes on to explain the tort of bad faith breach of an insurance contract. The court stated "the substance or gravamen of the wrong . . . is an *unreasonable* refusal to pay benefits due under the terms of the policies. . . . [and] that the ultimate test of liability in [these] cases is whether the refusal to pay policy benefits was *unreasonable.*" (*Id.*, at pp. 31-32.)

■ The implied covenant of good faith and fair dealing requires that each contracting party refrain from doing anything which would injure the right of the other party to receive the benefits of the agreement. (*Egan* v. *Mutual of Omaha Ins. Co.* (1979) 24 Cal.3d 809, 818 [169 Cal.Rptr. 691, 620 P.2d 141]; *Murphy* v. *Allstate Ins. Co.* (1976) 17 Cal.3d 937, 940 [132 Cal.Rptr. 424, 553 P.2d 584]; *Crisci* v. *Security Ins. Co.* (1967) 66 Cal.2d 425, 429 [58 Cal.Rptr. 13, 426 P.2d 173].)

In order for the insurer to fulfill its obligation not to impair the right of the insured to receive the benefits contracted for, the governing standard is that the insurer must give at least as much consideration to the insured's interests as it does to its own. (*Egan* v. *Mutual of Omaha Ins. Co., supra,* 24 Cal.3d at pp. 818-819; *Silberg* v. *California Life Ins. Co.* (1974) 11 Cal.3d 452, 460 [113 Cal.Rptr. 711, 521 P.2d 1103].)

In *Austero,* the court found that the insurer handled the plaintiff's claim in a *reasonable* manner. There, the plaintiff filed a disability claim after he had allowed his policy to lapse for nonpayment of premium. Plaintiff claimed he had been totally disabled since September 1973 and that he had ceased practicing law on September 20. However, his attending physician wrote "does not apply" in the sections of the claim form regarding plaintiff's total disability, partial disability and date he would be able to return to work. (*Austero* v. *National Cas. Co., supra,* 84 Cal.App.3d at pp. 9-13.)

Despite the fact that plaintiff's policy had lapsed, the insurer sought plaintiff's medical records. The insurer also sought an explanation of the phy-

sician's "does not apply" responses but received no reply. The insurer denied plaintiff's claim because his disability occurred after the policy had lapsed. (*Id.*, at pp. 12-13.)

Thereafter, plaintiff's son sent the insurer a letter alleging for the first time that plaintiff's onset of disability had occurred before the lapse of the policy. The insurer reconsidered plaintiff's claim. It directed several requests to various sources for additional information. All the requests made to plaintiff went unanswered. The only medical opinion to the effect that plaintiff was totally disabled prior to the lapse of the policy was found in a second letter from one of plaintiff's treating physicians. However, even this letter demonstrated that the doctor formed his opinion from statements made to him by plaintiff's son. Thus, the insurer reaffirmed its prior decision to reject plaintiff's claim. (*Id.*, at pp. 13-17.)

The *Austero* court found this evidence so conclusive that it ruled as a matter of law that the insurer's handling of plaintiff's claim was eminently reasonable and that the insurer had taken into account equally and fairly both the interest of the insured and its own. (*Id.*, at pp. 35-36.)

*Austero* stands in vivid contrast to *Silberg* wherein the insurer's conduct was egregious. In *Silberg,* the insurer denied the insured medical benefits until it could determine whether worker's compensation would cover the injury. As a consequence of the denial, the insured went without insurance payments for two years while awaiting the Worker's Compensation Appeals Board's decision, which finally resulted in a compromise and release of the insured's claim. (*Silberg* v. *California Life Ins. Co., supra,* 11 Cal.3d at p. 456.)

In the interim, the insured was forced to borrow money to pay his hospital bills. Nonetheless, most of his hospital and doctor bills remained unpaid. The insured was forced to change hospitals as well as doctors in order to obtain continuing medical treatment. He lost his dry cleaning business and had to change residences several times to avoid creditors. The final blow came when his wheelchair was repossessed and he was unable to afford to purchase pain killing medication. (*Id.*, at pp. 457-459.)

The *Silberg* court found this evidence so conclusive that it ruled *as a matter of law* that the insurer had unreasonably handled the insured's claim. (*Id.*, at p. 462.)

The facts of *Silberg* demonstrate that the insurer had not given equal consideration to the insured's claim as it had to its own interests. As the *Silberg* court pointed out, insured's policy application declared in bold

print, "'Protect Yourself Against the Medical Bills That Can Ruin You.'" Yet, even though insurer knew that the insured earned only a modest income, had incurred substantial medical and hospital bills, had no other hospital or disability insurance and would probably not qualify for worker's compensation benefits, it did not pay his medical bills. Even if the insurer had paid the bills and it were ultimately determined that the insured was entitled to worker's compensation benefits, the insurer could have recovered the payments it made by asserting a lien in the worker's compensation proceeding. (*Id.*, at p. 461.)

*Gruenberg* v. *Aetna Ins. Co.* (1973) 9 Cal.3d 566, 575 [108 Cal.Rptr. 480, 510 P.2d 1032], presented another purported outlandish fact situation wherein the Supreme Court held that plaintiff had sufficiently stated a cause of action as against a demurrer by alleging that "defendants wilfully and maliciously entered into a scheme to deprive [plaintiff] of the benefits of the fire policies in that they encouraged criminal charges by falsely implying that he had a motive to commit arson, and in that, knowing plaintiff would not appear for an examination during the pendency of criminal charges against him, they used his failure to appear as a pretense for denying liability under the policies."

■ From the discussions in *Austero, Silberg* and *Gruenberg*, it is apparent that whether an insurer's denial of a claim is *unreasonable* is dependent upon the *facts* in each case. The issue remains a question of fact unless only one inference may be drawn from the evidence. (*Loughan* v. *Harger-Haldeman* (1960) 184 Cal.App.2d 495, 503 [7 Cal.Rptr. 581]; see *Rice* v. *Southern Pacific Co.* (1967) 247 Cal.App.2d 701, 706 [55 Cal.Rptr. 840].) In *Austero* and *Silberg,* the courts made their holdings a matter of law because the evidence was so strong in each case concerning the reasonableness of the insurer in the handling of the insureds' claim.

(b) *Reasonableness may include a duty to investigate claim.*

■ Subsequent to *Austero* and *Silberg,* the Supreme Court decided *Egan* v. *Mutual of Omaha Ins. Co., supra,* 24 Cal.3d at page 817, wherein the court held that an insurer may breach the covenant of good faith and fair dealing by failing to properly investigate an insured's claim.

The plaintiff in *Egan* claimed and received payments from the insurer for three separate back-related disabling injuries that occurred between 1963 and 1970. In May 1970, he suffered another back injury and was compensated with three months of payments. In October of 1970, the plaintiff filed a supplemental claim and received another three months of disability payments. On February 26, 1971, surgery was performed on the plaintiff's

back and he submitted another claim. On the physician's portion of the claim form the surgeon estimated that plaintiff could return to work "possibly 3-6 months from date of surgery." (*Egan* v. *Mutual of Omaha Ins. Co., supra,* 24 Cal.3d at pp. 815-816.)

The claims adjuster for the insurer reviewed the plaintiff's hospital records, the records of the Worker's Compensation Appeals Board and the State Compensation Insurance Fund. However, at no time did the adjuster have plaintiff examined by an insurer's doctor or even consult with plaintiff's treating physicians and surgeon regarding the extent of his disability. Instead, the claims adjuster merely reclassified plaintiff from injury to non-confining illness as a result of a review of the records. The claims adjuster then visited the plaintiff, notified him of the reclassification and handed him a check for medical costs and three months maximum disability payments, which the plaintiff refused. The adjuster even offered the plaintiff a larger check if he would agree to surrender his policy. (*Id.,* at p. 816.)

In arriving at its decision in *Egan,* the Supreme Court noted that the purpose of a disability insurance policy is to protect the insured against calamity, to give the insured peace of mind and security in the event that the insured is unable to work. It stated: "To protect these interests it is essential that an insurer fully inquire into possible bases that might support the insured's claim. . . . an insurer cannot reasonably and in good faith deny payments to its insured without thoroughly investigating the foundation for its denial." (*Id.,* at p. 819.)

We interpret the duty to investigate in *certain fact situations* enunciated in *Egan* as consistent with the test of reasonableness in the handling of insureds' claims as spelled out in *Austero.* Under certain circumstances, in order to fulfill its obligation not to impair the right of the insured to receive the benefits contracted for and to give the insured's interests as much consideration as its own, an insurer must investigate an insured's claim.

There is no reason to limit the applicability of such a duty to investigate disability insurance cases, as was the case in *Egan,* since the purpose of health and accident insurance is also to protect the insured against calamity and to provide peace of mind and security.

The *Austero* court did not use duty to investigate language, but it did base its holding that the insurer had acted reasonably on the fact that the insurer volitionally sought information from various sources to determine if the insured's claim was compensable, and in effect, sufficiently investigated the claim that had been filed. (*Austero* v. *National Cas. Co., supra,* 84 Cal.App.3d at pp. 35-36.)

■ Because of the consistency between *Austero* and *Egan,* whether an insurer breached its duty to investigate continues to be a question of fact to be determined by the particular circumstances of each case. The *Egan* court affirmed the trial court's granting of a directed verdict on the issue of the insurer's breach of the implied covenant of good faith and fair dealing because the evidence was *undisputed* that the insurer failed to properly investigate the insured's claim. "[What] is ordinarily a question of fact . . . may be a question of law where but one inference can be drawn from the evidence . . . ." *(Loughan* v. *Harger-Haldeman, supra,* 184 Cal.App.2d at p. 503.)

## 2. *Directed verdict improper here.*

### (a) *Standards for directed verdict.*

■ A directed verdict is proper only when, disregarding conflicting evidence and giving the opposing party's evidence every legitimate inference which may be drawn therefrom, the result is no evidence of sufficient substantiality to support a verdict in favor of the opposing party. *(Miller* v. *Elite Ins. Co.* (1980) 100 Cal.App.3d 739, 757 [161 Cal.Rptr. 322]; *Toole* v. *Richardson-Merrell Inc.* (1967) 251 Cal.App.2d 689, 708 [60 Cal.Rptr. 398, 29 A.L.R.3d 988].) Unless it can be said as a *matter of law* that no other reasonable conclusion is legally deducible from the evidence, and that any other holding would be so lacking in evidentiary support that a reviewing court would be compelled to reverse on appeal, or a trial court to set it aside, the trial court is not justified in taking the issue from the jury. *(Miller* v. *Elite Ins. Co., supra,* at p. 757; *Spillman* v. *City etc. of San Francisco* (1967) 252 Cal.App.2d 782, 786 [60 Cal.Rptr. 809].)

■ In order to determine whether the directed verdict was properly granted, we must apply the aforementioned test to the particular facts in this case.

### (b) *Facts of this case.*

The trial on the liability issue consumed 14 days during which time 14 witnesses testified. Paulfrey was an employee at Blue Chip, and as such was covered by an Aetna policy for health and accident insurance at the time of her accident. Blue Chip as an employer arranged for Aetna to cover its employees with a group policy.

#### (1) *Blue Chip and Aetna evidence.*

Martha Crocker (Crocker), employee benefits administrator at Blue Chip, was responsible for processing employee insurance claims. Upon learning

of Paulfrey's August 1, 1972, accident, Crocker promptly sent Aetna medical insurance forms to Paulfrey. Paulfrey admitted receiving these forms. At some later date, Crocker also sent other forms to Paulfrey so that she could apply for long term disability benefits.

Crocker contacted both Paulfrey and Paulfrey's mother each on three or four occasions regarding the whereabouts of the Aetna forms so that she could process the claim. Paulfrey acknowledged during one of these calls that she had not mailed the Aetna forms back to Blue Chip. Crocker advised Paulfrey that before a claim could be submitted to Aetna, the statement of claim would have to be filed. Meanwhile, the disability claim forms, which coverage was provided by another insurer, were completed by Paulfrey and returned to Crocker.

Crocker never received the Aetna accident claim form. Therefore, Blue Chip concluded that Paulfrey did not wish to file a claim for Aetna accident benefits.

On September 20, 1972, Paulfrey applied for Medi-Cal benefits, and Medi-Cal paid Paulfrey's County USC hospital bill.

Aetna did not receive a completed claim form from Paulfrey, nor did it receive bills for medical care until February of 1976, approximately three and one-half years after Paulfrey's accident. Even then, the bills submitted totalled only $258, $93 of which were for medical expenses incurred by Paulfrey's son who was not covered under the Aetna policy. Forty-five dollars in bills were for ambulance, pharmacy and emergency room outpatient services rendered to Paulfrey on the date of the accident, and $120 in bills were for an orthopedic examination and X-ray services rendered to Paulfrey on November 13, 1973.

In late 1975, someone from the law firm representing Paulfrey contacted Crocker and asked if Paulfrey's medical bills would be paid if they were submitted. Crocker responded that she would forward the bills to Aetna for consideration. In February of 1976, the above-referenced four bills were received by Blue Chip and promptly transmitted to Aetna.

The evidence was uncontroverted that the $12,146 County USC hospital bill was never seen by Aetna or Blue Chip until the time of trial and that neither Aetna nor Blue Chip were aware that Medi-Cal had paid this bill until that date. No one, including the director of medical records at County USC Hospital, testified that any hospital bill was ever sent to Blue Chip or Aetna.

Crocker repeatedly testified that a prerequisite to sending a claim to Aetna was a bill enumerating services and charges. This point was corroborated by Aetna employees. An expert witness on insurance practices testified that there was no completed claim and proof of loss without a bill.

When Aetna received Paulfrey's four bills in 1976, it denied the claim as untimely because the policy required proof of loss to be furnished within 90 days, or in no event later than one year after the expiration of the initial 90-day period.

Accepting Aetna and Blue Chip's testimony, it could be inferred that even if Paulfrey had originally intended to file a claim with Aetna, she subsequently changed her mind. Therefore, any duty Aetna had to investigate was satisfied by Crocker's repeated calls to Paulfrey after her release from the hospital requesting she return the claim form.

(2) *Paulfrey evidence.*

Paulfrey received the Aetna form while she was hospitalized at County USC, and she, as well as her attending physicians, filled out the form. Paulfrey then gave the form in a stamped envelope to her fiance for mailing and was subsequently informed by him that he had mailed it.

She thereafter contacted Crocker and inquired as to whether any further actions were necessary on her part, and Crocker responded, "everything is fine." Therefore, Paulfrey believed that nothing else needed to be done and took no further actions with respect to the Aetna claim.

It was stipulated that Aetna and/or Blue Chip did have in its file two documents—an assignment of Paulfrey's rights to Aetna health benefits to the County USC Hospital, and a medical report and certificate of hospital care. Paulfrey presented testimony from several witnesses that these documents were at least sufficient to get her claim started.

From this evidence, it could reasonably be concluded that even absent the Aetna claim form, Aetna and Blue Chip were sufficiently placed on notice of Paulfrey's claim for health benefits. From such notice, they should have investigated further by placing a call to County USC Hospital and requesting the bill.

The possible interpretations vividly demonstrate that this case presented credible evidence, provided certain witnesses were believed by the jury, which could support either Paulfrey's position or that of Aetna and Blue Chip. This case is therefore unlike the cases of *Austero, Silberg* and *Egan*

cited herein where the evidence was overwhelmingly one sided. The facts herein do not disclose outrageous conduct on the part of Blue Chip or Aetna as a matter of law. The evidence was conflicting, and there was more than one inference that could have been drawn from the evidence. For these reasons, the factual issues should have gone to the jury.

### 3. *When duty to investigate is triggered.*

The Supreme Court in *Egan* enunciated the duty to investigate, and found it applicable to the fact situation therein, but the court did not elaborate on standards for applicability.

Clearly, where an insurer's conduct in failing to investigate a legitimate claim falls short of reasonableness as a matter of law, a duty is required. However, in a case such as the one before us, the issue as to the insurer's duty to investigate is clouded, albeit the insurer's conduct in the handling of a claim is always measured by the standard of reasonableness in any fact situation.

█ Recognizing the body of law that interprets insurance contracts more favorably to insureds when a conflict arises, (e.g., *Estate of Coate* (1979) 98 Cal.App.3d 982 [159 Cal.Rptr. 794]; *Healy Tibbits Constr. Co.* v. *Employers' Surplus Lines Ins. Co.* (1977) 72 Cal.App.3d 741 [140 Cal.Rptr. 375, 97 A.L.R.3d 1258] (ambiguity construed against insurer); *McMackin* v. *Great American Reserve Ins. Co.* (1971) 22 Cal.App.3d 428 [99 Cal.Rptr. 227] (ability to deny disability benefits construed against insurer)), nonetheless, an insurance contract is a bona fide contract between the insurer and the insured. As such, an insured has certain obligations to perform pursuant to the contract before an insurer has a duty to pay benefits thereunder.

█ "[A]n insurer is not required to pay every claim presented to it. Besides the duty to deal fairly with the insured, the insurer also has a duty to its other policyholders and to the stockholders . . . not to dissipate its reserves through the payment of meritless claims." (*Austero* v. *National Cas. Co., supra,* 84 Cal.App.3d at p. 30.)

█ Insurance contracts legitimately call for the filing of a claim, complete with proof of loss. █ It would seem reasonable that any responsibility to investigate on an insurer's part would not arise unless and until the threshold issue as to whether a claim was filed, or a good faith effort to comply with claims procedure was made, has been determined. In no event could an insured fail to keep his/her part of the bargain in the first

instance, and thereafter seek recovery for breach of a duty to pay seeking punitive damages based on an insurer's failure to investigate a nonclaim.

In the present case the insurance contract to which Paulfrey was a party provided, in relevant part: *"Written notice of claim* must be furnished to the Insurance Company within 20 days after the occurrence or commencement of any loss or period of disability covered by the policy, or as soon thereafter as is reasonably possible. . . . [¶] The Insurance Company, upon receipt of a written notice of claim, will furnish to the claimant such forms as are usually furnished by it for filing proofs of loss. If such forms are not furnished within 15 days after the giving of such notice, the claimant shall be deemed to have complied with the requirements of this policy as to proof of loss upon submitting within the time fixed in the policy for filing proofs of loss, written proof covering the occurrence, the character, and the extent of the loss for which claim is made. [¶] *Written proof covering the occurrence,* the character, and the extent of loss must be furnished to the Insurance Company, . . . , within 90 days after the termination of the period for which the Insurance Company is liable, and in case of claim for any other loss, within 90 days after the date of such loss. Failure to furnish such proof within the time required shall not invalidate nor reduce any claim if it was not reasonably possible to give proof within such time, provided such proof is furnished as soon as reasonably possible and in no event, except in the absence of legal capacity of the employee, later than one year from the time proof is otherwise required. No action at law or in equity shall be brought to recover on this policy after the expiration of three years after the time written proof of loss is required to be furnished." (Italics added.)

 What constitutes a claim and the filing thereof pursuant to provisions of a contract are mixed questions of fact and law. To keep her part of the bargain, Paulfrey here was obligated under these provisions to furnish written notice of the claim to Blue Chip or Aetna together with written proof covering the occurrence and extent of the loss. The standard of reasonableness, along with other rules governing insurer conduct set down by case law, dictate that unless and until Paulfrey satisfied both requirements, or substantially complied therewith, Aetna and its' agent, Blue Chip, were under no obligation to investigate Paulfrey's claim.

## CONCLUSION

This case presented conflicting testimonial evidence from a number of witnesses, the credibility and the weight of which evidence was for the jury to determine. The significance of certain documentary evidence, and when and how such evidence became lodged in files, was also for the jury. Fi-

nally, whether a duty arose to investigate depended on what facts the jury found to be true.

Because the trial court removed legitimate issues of fact from the jury's consideration, the directed verdict was error. Since the error of the directed verdict requires a reversal of the judgment, we need not reach other issues raised by the parties.

## DISPOSITION

The judgment is reversed. The case is remanded for further proceedings in light of this opinion.

Lui, J., and Danielson, J., concurred.

Respondent's petition for a hearing by the Supreme Court was denied March 14, 1984. Bird, C. J., and Mosk, J., were of the opinion that the petition should be granted.